PHILIP PLUNKETT, Complainant below, appellant v. PATRICK DILLON, Defendant below, respondent.

A written acknowledgment signed and given to the complainant by the respondent that they had on that day purchased the quantity of land described in it, the complainant paying for the same the sum of three thousand dollars, for which the respondent received the deed, but acknowledging and agreeing that the complainant was to be paid back his three thousand dollars with interest, and receive as his share of the profits, if any there should be, two-thirds, and he one-third, and if a loss should be sustained, they were to bear it in the said proportion ; and in consideration of his receiving the deed, he executed that day a judgment bond for three thousand dollars for which he held himself accountable until the property should be sold, when the proceeds of such sale should go to pay off said bond. And it was also at the same time agreed between them, though not stated in the acknowledgment, that in the mean time judgment should not be entered on the bond, and which was not done until five years and three months thereafter, nor until after most of the land had been sold, and the agreement had been denied and repudiated by the respondent. The land referred to lay in the city of Wilmington, and the latter proceeded soon after the purchase of it, to have it surveyed and laid off into city lots, and to erect houses and make other improvements upon them at his sole expense, and from time to time, to sell and convey the same as his own property. *Held* in the absence of any direct or positive evidence to the contrary, that the agreement constituted a *bona fide* and valid contract of partnership of a special char-

acter between them, and that the three thousand dollars paid by the complainant for the land, was an advance of capital by him on account of the partnership, and was not a usurious loan of that amount of money to the respondent under a false and fraudulent pretense of such a partnership contract for the purpose of evading the prohibition of the statute against usury, without adequate hazard or risk of the principal or any part of it in the undertaking, nor a grossly inequitable, hard or unconscionable contract for exorbitant profits on the amount of money embarked by him in it, without adequate risk or hazard of incurring any loss by it; and that, therefore, the complainant was entitled to receive, not only the amount of the bond with interest, but the respondent was bound to account to him for two-thirds of the net profits realized from the sale of the lots, independent of the improvements made upon them by him, and of the increased value of the land still retained and held by him.

THIS case came up on appeal from the decree of the Chancellor sitting in and for New Castle County, upon cross bills and answers filed by the parties respectively against each other, and was heard before Gilpin, C. J., Wootten, Houston and Wales, Associate Judges.

The bill of Plunkett, the complainant below in the first case, alleged that on the 10th day of August 1864, he and Dillon, the defendant below in it, verbally agreed that they would buy on their joint account from William Ferris and Philip Garrett, a tract of land in the city of Wilmington, on the terms and conditions, and for the objects and purposes agreed on between themselves as stated and set forth in a certain paper writing signed and delivered by him to the complainant on that day, after the purchase had been made, and the same had been conveyed by Ferris and Garrett, to Dillon in accordance with their verbal agreement in relation to it, which was as follows: " Wilmington, Delaware, August, A. D., 1864. This is to certify and show that P. Plunkett, of the city of Wilmington, New Castle County and State of Delaware, and I, Patrick Dillon of the same city and State, purchased from Ferris and Garrett three hundred and seventy-five feet of land fronting on Madison Street from Second to Third streets, and in depth ninety-seven feet, Philip Plunkett paying for the same the sum of

three thousand dollars, for which I received the deed for the same. But I acknowledge and agree for myself and my heirs, that said Plunkett is to be paid back his three thousand dollars with interest, and receive as his share of the profits, if any there shall be, two-thirds, and I one-third, and if a loss should be sustained, we are to bear it in the said proportion. In consideration of my receiving the deed, I executed this day a judgment bond for three thousand dollars for which I hold myself accountable until the property shall be sold, when the proceeds of such sale shall go to pay off said bond. Witness my hand the day and year written," and signed "Patrick Dillon." That the complainant, as stated therein, paid the whole of the said three thousand dollars to Ferris and Garrett, as the consideration and purchase money for the land mentioned and described in the foregoing written acknowledgment, and received as security therefor the judgment bond of Dillon for three thousand dollars, to be paid out of the proceeds of the property when sold, as also therein mentioned, bearing interest from the 10th day of August 1864, and upon which he entered judgment against him on the 10th day of November 1869, in the Superior Court in and for that county, and which he alleged remained still unpaid.

That Dillon was a master carpenter and had been engaged for many years in business transactions with him for their mutual profit, the complainant furnishing the means and capital, and he doing the active work in them, and in which mutual confidence had hitherto subsisted between them; his part of the business consisting in buying lots and building houses on them, with complainant's aid, who was generally paid out of the proceeds of them when sold. That it was thus carried on solely for his benefit, as the complainant had often put himself to much inconvenience to accommodate him, but in no case had taken or received from him more than the rate of six per cent. *per annum* for the loan or use of money in their transactions. That the particular trans-

action in question, was for their mutual benefit, and as he was a practical operator, and had greater facilities for the disposal of such property, than the complainant, it was agreed between them, as a matter of convenience in the disposal of the lots, that the deed for the property should be made to him alone, and that as soon as it was so taken, he entered into possession of it, and proceeded to divide it into building lots, some of which he sold without building on them, and the others he built on and sold with the houses on them, and thus disposed of most of the tract, but retained one or more lots for his own use, and was then residing on a portion of it.  The bill then specified the several building lots which had been so sold by him in the meantime, their dimensions in front and depth on the streets mentioned, also the dates of the deeds, the names of the purchasers, and the price paid for each, amounting in number to seventeen in all, and in the aggregate to the sum of twenty-nine thousand nine hundred and fifty-one dollars received by him from the sale of them.  That the front of the tract on Madison street was three hundred and seventy-five feet and eight inches, or eight inches more than is stated in the written acknowledgment and in the deed from Ferris and Garrett for it, and which with a depth of ninety-seven feet was the actual quantity of land that was conveyed to him, to be disposed of and accounted for under the agreement between them and the acknowledgment signed by him, either as co-partnership, or as trust property.  And that the sales showed that there was a portion of the tract remaining in his hands undisposed of, fronting thirty-two feet on Madison and twenty-seven on Second street, and that lots on the former were worth at the time they were sold by him, from twelve to twenty dollars per front foot, and those on the latter with a depth of from eighty to ninety-two feet, were worth from twenty-five to forty dollars per front foot.

That besides the amount due the complainant on the

judgment bond, and from the sales of the lots, and for so much of the tract as he had appropriated to his own use as before mentioned, the complainant had advanced to him on several occasions by way of loan, sums of money upon due bills, amounting in the aggregate of nine hundred and fifty four dollars. He had also furnished him with stone for houses he was building on Reed Street in that city to the value of twenty eight dollars; and if the settlement between them herein after stated, should be rejected or opened, he was also indebted to him in the further sum of three hundred and forty one dollars and seventy seven cents with interest from January 1st 1865, a balance of indebtedness on a book account contracted by him and James Plunkett, trading as Plunkett and Dillon, but whom he had survived, and for which he was, therefore, liable. Also in the further sum of ten dollars on a due bill made by him November 21st 1868, and transferred to the complainant for value; and which due bills first mentioned were surrendered and delivered up to him by the complainant June 28th 1869, on the occasion of an account taken and a settlement had between them as hereinafter set forth. On the day last mentioned they met to settle and adjust their accounts and claims against each other, and on stating them it was found he was indebted to him in a balance of three hundred and thirty four dollars and seventeen cents, for which amount he gave the complainant his promissory note of that date, payable to his order . on demand, which he still holds, and which the defendant neglects and refuses to pay, although it has been demanded of him. The original draft of the settlement containing all the items of account embraced in it, was annexed to the bill.

But that since that time he had annoyed and harassed him by a series of actions in the Superior Court for New Castle County, arising out of the said transactions, and threatens him with others touching the same. The actions referred to in that court were Patrick Dillon v. Philip Plunkett, Nos. 49, 68, 143 to May Term 1870, of

which No. 68 had been discontinued, but the renewal of it was threatened by him. The others, however, were still pending, and might be called up at the coming term of that court. No. 49 was in assumpsit on the common counts for goods sold and delivered, work and labor, money lent and advanced, paid, laid out and expended, and account stated, with a bill of particulars filed, a copy of which was annexed, and all of which arose out of and were connected with their business transactions before first stated, and were embraced in their settlement of June 28th 1869; whilst he wholly omits to give the complainant credit therein for either his share of the proceeds of the sale of the lots for which the judgment bond was given, or the amount of the due bills surrendered and given up to him on the settlement. While No. 143 was an action for damages claimed of the complainant for his failure to satisfy the judgment in that court upon the said bond for three thousand dollars herein before mentioned.

But the complainant did not object to opening the settlement of accounts before mentioned, as he believes several mistakes were admitted into it against him, which if corrected, would show that there then was, and still is, due him a greater sum than that for which the promissory note was taken, and alleged the following errors in it: The omission to make any allowance to him on account of the two-thirds of the lot sold to one of the purchasers before named, Philip Hearn, (unimproved) for fourteen hundred and fifty dollars, and of the land unsold and retained by, but not accounted for by Dillon, with a front of about thirty-two feet on Madison street, estimated to be worth twenty dollars per foot, and also in omitting the bill against him as surviving partner of the late firm of Plunkett & Dillon, for the balance due of three hundred and forty-one dollars and seventy-seven cents with interest. He had also failed to render any account of, or give the complainant credit for any portion of the proceeds of the lots fronting on Second street sold to the purchasers Morley & Gause for twenty-five hundred dollars as before

mentioned; so that none of the several matters herein last referred to, were considered or made a part of that settlement. The prayer was for an account and for a discovery in relation to the matters last alleged, if denied, and that the defendant might be decreed to pay him the amount which should be found to be due him on a just, full and true account of the several portions of the tract of land so bought and sold as aforesaid, and for an injunction to restrain the suits pending in the Superior Court, and the institution of other &c.

The answer of Dillon was as follows; That he denies that at the time and in the manner alleged by the complainant in his said bill of complaint, he agreed with complainant to buy on joint account the tract of land referred to in said bill of complaint, or that the said tract of land was purchased on joint account by the complainant and this defendant under any agreement either verbal or written; and this defendant further denies that he did at the time alleged in said bill of complaint or at any other time, sign any such paper writing, as is set forth in the first paragraph of the said bill of complaint, knowing the contents thereof, or any other agreement with complainant or any paper writing relating to the said tract of land, or to any dealings between him and the complainant on the said tenth day of August A. D. 1864, except a bond hereinafter mentioned; but this defendant avers that, if he did sign any paper writing of the tenor alleged in the said bill of complaint, his signature was obtained thereto fraudulently and upon false representations by complainant of and concerning the contents thereof.

And this defendant, further answering, saith that he did on the first day of August A. D. 1864, of his own option and without the knowledge of complainant, apply to William Bright as agent of Messrs. Ferris and Garrett to purchase two lots of the tract of land aforesaid, that Mr. Bright declined to sell less than four lots thereof; that defendant then mentioned the subject to the complainant and proposed to him to take two lots of the four with the

understanding that this defendant, when ready to build on them, would buy them of complainant or that complainant could sell them at his own option; that complainant replied that he had then in hand money not in use and if this defendant could make any thing by buying the whole tract, he, complainant, would lend this defendant the money; that upon the second day of August A. D. 1864, this defendant without speaking further upon the subject to complainant, went to Mr. Bright and purchased of him four lots of said tract of land paying him one hundred dollars on account, out of this defendant's own money, and at the same time requesting Mr. Bright not to prepare the deed until the defendant could decide whether he would take the whole tract; that this defendant then offered Mr. Bright seven dollars per foot for the whole tract and this offer being declined this defendant subsequently offered Mr. Bright eight dollars per foot and bought the property at that price, having no consultation or conversation with complainant on the subject; that the deed was prepared and this defendant requested Mr. Bright to go with him to the store of complainant on the said tenth day of August A. D. 1864; that complainant then lent to defendant the sum of three thousand dollars, taking as a security therefor defendant's bond which sum this defendant then paid to Mr. Bright (both the latter and this defendant inadvertently forgetting the one hundred dollars already paid by this defendant, which, however, Mr. Bright afterward repaid to this defendant and which this defendant then handed to complainant to be credited to this defendant on his said bond;) that at the time of the said payment of three thousand dollars to Mr. Bright by this defendant, Mr. Bright delivered to this defendant the deed of Messrs. Ferris and Garrett for the property and this defendant entered into possession of the same.

And this defendant, further answering, saith that he did agree to repay to complainant the loan aforesaid of three thousand dollars with six per cent. interest thereon, out of the proceeds of the sale of said tract of land when sold,

44

but this defendant utterly denies that he did ever at any time enter into any agreement with complainant either verbally or in writing for the joint purchase of said tract of land, but this defendant avers that a short time subsequent to the said purchase and the execution of the said bond, complainant approached him and suggested to him that in consideration of the many advantages to accrue to this defendant from holding said tract of land, he, the complainant was entitled to and should receive a greater *interest* than the six per centum secured to him by law upon the bond taken to secure said loan, and that then and there complainant proposed that this defendant should allow complainant two-thirds of the profits to accrue from the sale of three hundred and fifteen feet eight inches, front of said tract of land purchased as aforesaid by this defendant, (thereby excepting a sixty feet lot on the corner of Second and Madison Streets, which this defendant did not then propose to sell) which proposition of complainant this defendant neither acquiesced in nor declined.

And this defendant, further answering, denies that on the occasion just referred to nor on any other occasion did complainant ever make to him any proposition to bear any portion either of expenses or losses connected with the purchase or improvement of the said land, but avers that, on the contrary, this defendant has himself incurred and paid all expenses connected with the ownership of the said land including even the cost of the deed and the stamp affixed thereto and the taxes assessed upon the land from year to year.

And this defendant, further answering, saith that judgment *was* entered upon his said bond on the day and in the book and page mentioned in the said bill of complaint, but avers that at the time when complainant offered to lend him the said sum of three thousand dollars, this defendant objected that " it would do him no good," as he would be unable to sell the land out in lots, with a bond and mortgage against the property, but that complainant

then assured this defendant that there " should be nothing entered up against the property " so that this defendant could sell the same without incumbrance, and this defendant avers that the said judgment was entered in violation of the express agreement and promise of complainant as aforesaid that it should not be done. And this defendant further answering, saith that at the time of the entering of said judgment there was nothing due to complainant on account of the principal sum or interest secured by the same, but that on the contrary complainant was then and still is indebted to this defendant for a large sum of money.

And this defendant, further answering, saith that he is and has been for the past six or seven years a master carpenter and builder, but denies that he has been for many years engaged in business transactions with complainant for their mutual benefit and profit, or that complainant has furnished capital and this defendant done the active work in any joint enterprises, as in said bill of complaint is alleged, but this defendant says that any monies furnished to him by complainant during the said period have been as in the instance hereinbefore referred to, by way of loans which this defendant has in all such cases repaid to complainant with interest.

And this defendant, further answering, saith that the tract of land which he purchased as aforesaid with the sum borrowed from complainant and for securing which this defendant gave his bond as aforesaid, has been disposed of as follows, to wit: ¡ 1.—This defendant did build upon, for his own use, sixty feet on the corner of Second and Madison streets, but subsequently he sold a lot being part of the same 18 feet by 70 feet to Patrick Lally and conveyed the same to him with brick house thereon erected, by deed dated May 2, 1870, for $3000; also by deed dated November 2, 1865, a lot being part of the same 16 feet front by 70 feet deep with brick House thereon erected, to Mary S. Woodward for $1300; also by deed dated November 2, 1865, a lot being part of the same 16

ft. front by 70 feet deep with brick house thereon erected to Elizabeth Stroud for $1300. Thus there remained in the possession of this defendant a strip ten feet on the front disposed of as hereinafter mentioned. 2.—This defendant sold and conveyed to William Dougherty by deed dated August 18, 1864, a lot 97 feet deep by sixteen feet front on Madison street, immediately adjoining on the North the lot last aforesaid for the sum of $192, or twelve dollars per foot, which said sum of $192 this defendant avers that he immediately paid over to complainant to be entered as a credit in favor of this defendant on his said bond for $3000. And this defendant further saith that he hath since the date of said last mentioned sale repurchased the said lot of sixteen feet front from the said William Dougherty and paid him therefor and has disposed of the same as hereinafter mentioned. 3.—This defendant sold and conveyed to Thomas Curley by deed dated Aug. 18, 1864, a lot 32 feet front on Madison street by 97 feet deep at the distance of 64 feet on the North from the last mentioned lot, for the sum of $384, or twelve dollars per foot, which sum of $384 this defendant avers that he received and immediately paid over to complainant to be entered as a credit on his said bond for $3000. 4.—To the strip of land fronting 27 feet on Second street and back of the said first mentioned lots sold this defendant added three feet and eight inches front, from other land belonging to this defendant, and running the same back, to make the full depth of eighty feet from Second street, built thereon two brick houses, and sold the same as follows: one with lot 80 feet deep by 15 feet 4 inches front, conveyed by deed dated April 15th, 1870, to Springer, Morley & Gause, for the sum of $2500; and the other with lot of the same dimensions conveyed by deed dated the same day to Bauduy Simmons for the sum of $2500. 5.—Upon 166 feet front on Madison street in two lots not before mentioned, together with 10 feet retained as aforesaid, and the 16 feet repurchased from William Dougherty as aforesaid making in all one hundred and ninety-two feet front, part of which

was 97 feet, and part 70 feet deep, this defendant in the year 1869, erected (12) twelve houses under a contract with Bauduy Simmons, Geo. S. Capelle, Jno. H. Bennett, Lewis Curlett and the complainant, each of whom agreed to purchase one of said houses, and a separate agreement with the Steam Brick Company, who agreed to purchase two of said houses; this defendant was to build the houses according to the contract, and to furnish all necessary labor and materials, and to sell them to the parties aforesaid at the price of $1900, when the lot was 97 feet deep, and at $1800, when the lot was 70 feet deep.

After he had, at his own expense, graded the land and made estimates for the buildings, he fixed the value of the land at $12 per foot, and noted the same in a book and showed it with all his other estimates in regard to the cost of said houses to complainant, who concurred in the valuation, and agreed to purchase one house as aforesaid upon said estimates.   True copies of the said contract and estimates this defendant has annexed hereto, and craves leave to produce the originals thereof at the hearing of this cause.   And after the said houses were finished he conveyed seven of them to the several parties who had contracted to purchase them as aforesaid or to their assigns, to wit; one to John J. Dougherty as assignee of the Steam Brick Company by deed dated April 12th, 1869, with lot 97 feet by 16 feet, credited to this defendant by the said Company for $1900, though sold by the Company to Dougherty at $1800, the consideration mentioned in the deed; one to Bauduy Simmons by deed dated April 5th, 1869, with lot 97 feet by 16 feet for $1900; one to the complainant by deed dated July 13th, 1869, with lot 97 ft. by 16 ft. for $1900; one to William Silver, Jr. as assignee of Lewis Curlett by deed dated January 19th, 1869, with lot 97 feet by 16 feet and with back building in addition to specifications of contract, credited to this defendant at $2500 by Curlett, and sold to Silvers by him for $2800; one to John H. Bennett, by deed dated January, 19th, 1869, with lot 97 feet by 16 feet and with same addition as

last aforesaid for $2500; one to the Steam Brick Company by deed dated Sept. 8th, A. D. 1868, with lot 97 feet by 16 feet for $1900; and one to John T. Tazewell as assignee of George S. Capelle, by deed dated January 16th, 1869, with lot 70 feet by 16 feet for $1800. Of the remaining five houses four were sold by the defendant to sundry persons as follows; one by deed dated August 7th, 1869, to John W. Lynch, with lot 97 feet by 16 feet, for $1750; one by deed dated March 9th, 1869, to James Cook with lot 97 feet by 16 feet for $1775; one by deed dated March 4th, 1869, to Ann McCruddin with lot 70 feet by 16 feet, for $1700; and one by deed dated July 13th, 1869, to William Marshall with lot 70 feet by 16 feet for 1600. The one house remaining undisposed of was sold by this defendant, but owing to the judgment hereinafter mentioned, the purchaser declined to accept the title, and the same is now held by this defendant.

6.—The remainder of said tract of land being one hundred and one feet eight inches front on Madison Street by ninety-seven feet deep, situated upon the corner of Third and Madison Streets was sold by this defendant to Philip C. Hearn, for $1450. In payment therefor, this defendant took from said P. C. Hearn a mortgage for the full amount of $1450 purchase money and immediately assigned and transferred the said mortgage to the complainant, and the same was accepted by him to be a credit upon this defendant's said bond for $3000. Subsequently, the said Hearn permitted the said lot to be sold by the city, in default of payment of an assessment for grading and paving. And this defendant avers that complainant was then a member of the city council, and the chairman of the committee on streets thereof, that this lot was sold as aforesaid by the city under the direction of complainant, as such chairman of said committee; that he, the complainant well knowing that the mortgage assigned to him, as aforesaid, by this defendant, was a prior lien upon the said property, permitted it to be sold to Jacob Herdman and James Cleaden for the sum of $225, being the amount

necessary to pay the city's claim for curbing and paving; that immediately after said sale, complainant caused to be issued a writ of levari facias under which the said property was sold, and owing to the adverse claim set up by Herdman and Cleaden, was bid in by complainant for $1000, he thereby acquiring a clear title to the property at that price, with the benefit of curbing and paving done at the expense of the said Herdman and Cleaden; that complainant sold the same lot to John McCloskey for $2500, taking his bond and a mortgage on another property valued at $4500, that afterward McCloskey becoming dissatisfied through the representations of Herdman and Cleaden, complainant took the property back and continues to hold it up to the present time, being satisfied, and having so expressed himself, that the lot is now worth $10 per foot more than McCloskey had paid him for it. And as this defendant further avers, complainant has been offered and has refused $30 per foot for a part of said lot.

And he further saith that the actual depth of Madison street from Second to Third street is, as this defendant believes, 375 feet and 8 inches, and this defendant did purchase from Messrs. Ferris and Garrett and go into possession of the whole of this front with a depth of 97 feet. And that the value of the said lots at the time of the sale thereof has been hereinbefore fully stated, in the prices for which the vacant land was sold, and the estimated value which the defendant placed upon the 166 feet before referred to before building on the same, and which estimate was submitted to complainant and at which complainant agreed to purchase the said house and lot sold to him as aforesaid by this defendant.

And he further saith that he had at sundry times borrowed from complainant sums of money and given his due bills therefor, but avers that all of said due bills were for sums of money to be used in the business of this defendant and in transactions entirely foreign to the subject matter of this cause, and that the same were paid and delivered up to this defendant long prior to the transac-

tions referred to in the said bill of complaint, except one due bill for $50, which this defendant admits was due at the time of the alleged settlement of the twenty eighth day of June 1869, and was then delivered up to defendant; and this defendant also admits his legal obligation under the due bill for $10 referred to by complainant in his said bill of complaint, but denies that it was ever delivered up to defendant: and this defendant further answering admits that complainant was entitled to a charge of $28 for stone as in his said bill of complaint is alleged, but denies that any thing is due from him to complainant for or on account of any of the said amounts, because he avers that complainant is largely indebted to him upon a correct statement of their mutual accounts, and this defendant further answering, denies that he is indebted to complainant in any such amount as is in said bill of complaint alleged to be due as a balance of indebtedness on book account contracted by this defendant and James Plunkett. And this defendant also denies that complainant ever had any book account against this defendant as a member of any such firm as is in said bill of complaint alleged, or for any other amount.

And he further denies that any settlement of their mutual accounts was had as alleged in said bill of complaint, but avers that by invitation of complainant he went to the office of the complainant at or about the time alleged, that complainant had already prepared and lying on his table a paper similar to the one annexed to the said bill of complaint but which this defendant is unable to admit was the same, not having then or since examined it, and the interview not lasting for more than fifteen or twenty minutes, that complainant at once informed this defendant that there was due from him to complainant the sum of $334.17 and demanded a due bill for that amount, which this defendant gave without further investigation, reposing in complainant undue confidence : that afterward on making some calculations as to his accounts with complainant, this defendant discovered that complainant was

indebted to him in a large balance and has frequently demanded of complainant a settlement of the same which complainant has repeatedly refused. And this defendant denies that there ever was a balance struck between himself and complainant and a settlement made, and also denies that the paper writing marked A and annexed to the said bill of complaint is a correct statement of the accounts of this defendant with complainant, but avers that the same is false and fraudulent in many essential particulars, because when this defendant by his friends examined the said account on the books of complainant and pointed out the errors therein, complainant persistently refused to rectify the same, although erroneous, as this defendant avers, in the following particulars, to wit: 1.—An error against this defendant of $450 in the omission to credit defendant with the Hearn mortgage hereinbefore mentioned, amounting to $1450, which was assigned to complainant as a payment on bond, in lieu of which this defendant is credited with $1000, for which sum complainant bought in the lot on which the said mortgage was given, as aforesaid. And this defendant avers, that upon his own statement he should be credited with the said sum of $1450, the amount of the mortgage assigned, and if the partnership alleged in said bill of complaint were admitted or established, then this defendant should be credited with one third of the profits accrued to complainant upon the said lot, at complainants own valuation of it, viz.; $3500. 2.—An error in not only failing to credit this defendant with T. Curley's note given to this defendant for money due and owing to him and transferred to complainant, and since paid by the maker to complainant, amounting to $615.67, but, also, in that, complaint has actually entered a charge in said statement against this defendant of the amount of the said note, (charging it in the said statement simply as "note," whereas upon complainant's own books the defendant avers that this item is charged "Curley's note") together with interest thereon, amounting to $55.45, making this an error against this defendant in the final

45

balance, by reason of this item alone, of $1286.75. 3.—An error in crediting this defendant with the price of the house on Madison street, built for complainant under contract as aforesaid, credited at $1800 in lieu of $1900, as it should be, according to the terms of said contract and as also appears by the complainant's deed for the same as recited in the said bill of complaint; making this an error against this defendant of $100. 4.—An error in failing to credit this defendant with sundry items, viz.: trunking Reed Street Row,$5.25, ¼ trunking, $6.25 ; city tax on Second Street house, $7.19; also water rent $5.; also lumber from B. Simmons, $16.05, Curley's gable end collected by complainant $76 ; Lang's interest collected by complainant, $21 ; cash paid George O'Neil $3 ; making in all a further credit due defendant, not included in said statement, of $139.74. 5.—An error in making the following charge,viz ; To 166 feet land sold for 12 houses at $16 per foot, $2656," being a charge against this defendant for the value of his own land in and to which complainant had neither right nor title ; which land had been fully paid for by this defendant, and with the $3000 borrowed from complainant on his bond as aforesaid, which sum of $3000, was previously charged against this defendant in the said statement, the said charge of $2656 being, as this defendant avers, false, fraudulent and utterly unwarranted since even were the partnership alleged by complainant admittted, complainant could not charge this defendant with two-thirds of the profit on the sale of the said 166 feet, the first cost of the whole of the said tract of land having been previously charged by complainant in the amount of defendant's said bond; deducting from this amount of $2656, a credit of one-third of the alleged profits on said sale, $473.33, there remains $2182.67 charged in error against this defendant by reason of this item alone. 6—An error in charging the amount of this defendant's due bill for $334.17 fraudulently obtained as aforesaid without consideration upon the said false statement of account. 7.—Difference of interest accounts between the said state-

ments of complainant and defendant's bill of particulars amounting in all to $508.54 in favor of this defendant.

And he further admits that he has commenced certain actions against the complainant as the same are enumerated in the complainant's said bill of complaint. One of said suits, to wit: No. 49, To May Term 1870, is for the recovery of a balance due to this defendant from complainant for money paid to the complainant without consideration and held by him to the use of this defendant fully set forth in the bill of particulars, a copy of which is annexed to complainant's bill of complaint, including the items of error last before recited, and that it is one of the suits the prosecution of which is restrained by the preliminary injunction issued in this cause.

That he utterly denies that there was any settlement of accounts as therein alleged, and .that at the time of said alleged settlement there was any balance. due from him to complainant, but avers that a large balance, to wit, the sum of $5,001.87 was then and still is due with interest from February 1, 1870, from complainant to this defendant. And this defendant denies that any due bills were delivered up to the time of said alleged settlement except the said due bill for $50 aforesaid ; that complainant had any interest in any sales of lands made by this defendant, of the tract of land herein referred to, or any other land sold by him, or that any agreement or agreements have ever been made between him and complainant as by complainant in said bill of complaint are alleged to have been made.

And he further saith, that the action No. 143 to said term is a suit for damages for the refusal by complainant to enter satisfaction upon the record of the judgment fraudulently entered by complainant as aforesaid upon the said bond of this defendant, the prosecution of which action is also restrained by the preliminary injunction issued in this cause. And this defendant avers that the whole amount due upon said bond for principal and interest, has been fully paid, and was so paid long before

said judgment was entered, and that complainant caused said judgment to be entered with the vindictive desire to injure said defendant, he, the complainant, saying at the time, and also when requested to enter satisfaction as aforesaid, to defendant and to other persons that "he (complainant), would sell him out, that is the way he would enter satisfaction," "that he would sell the pot from under his bed, and the kettle from off his stove," "that he would make him bite the dust," and other like expressions. And this defendant further avers, that by reason of the entering of said judgment against him by complainant, his business, which consisted largely of buying real estate, building on it, and selling again, was entirely stopped ; that he was greatly embarrassed financially ; that he was obliged to assign property, amounting in value to about $30,000 to certain persons, to sell the same at public sale for the benefit of his creditors ; and that in some cases his friends were compelled to give bonds of indemnity against this judgment to the purchasers of his real estate, and in others, purchasers declined to take title from him, owing to the complainant's refusal to satisfy said liens; and his conduct in the premises, by means and reason of which this defendant sustained damages to the amount of about $10,000. And he further answering, saith, that he has already fully answered the statements contained in the bill of complaint, and here again denies that complainant is entitled to any credits arising from the sale of the lands mentioned or any other lands of this defendant, or any such balance of $341.77 as is alleged in said bill of complaint, to be due from this defendant as a surviving partner of any such firm as is therein alleged, or of any other firm.

The cross bill filed by Dillon against Plunkett, after referring to the bill of Plunkett filed against him, and the prayer of it and his answer to it, stated that he was advised that he was entitled to relief in that court in connection with the subject matter of said bill and an-

swer, which he could not obtain by a decree in that cause, and thereupon he filed that, his cross bill in order that the claims of the respective parties in it, might be fully heard and considered, and a decree be made in accordance with their respective rights in the premises.

That on the 10th day of August 1864, desiring to purchase of Messrs. Ferris & Garrett, of said city and State, a tract of land situate on the easterly side of Madison Street, between Second and Third streets in said city, he procured from the defendant, Plunkett, a loan of three thousand dollars, for which he executed and delivered to him on the same day his bond with warrant of attorney for the confession of judgment annexed thereto. And that immediately after procuring the money from him, he completed the purchase of the tract of land from William Bright, the agent of Ferris & Garrett, and paid him for the same $2,900 out of the said sum of $3,000 which he had borrowed of the defendant as aforesaid, having at the time of his agreement to purchase it, paid out of other funds of his own, $100 to Bright on account, when he received a deed for the land and entered into possession of it. And that he proceeded at once to improve and build upon it, and to sell lots from it, improved and unimproved, and from time to time paid over to the defendant sums of money received by him as well from the sale of the said lots as from other sources, intending such payments to be entered by the defendant as credits upon his bond which he held as security for the loan of the three thousand dollars aforesaid, and supposing that the said payments were so credited by him. That on or about the 28th day of June 1868, he went by the invitation of the defendant to his office, where he already had prepared and lying on his table, a paper writing, or account, which the defendant presented to him as a statement of the mutual accounts between them, and informed him that there was due from him to the defendant, the sum of $334.17, and demanded a due bill for that amount, which he, reposing undue

confidence in the defendant, gave him wit'_ _ _t further investigation. He was unable to state from memory the contents of the paper or account, not having then or since examined it, the interview not lasting longer than fifteen or twenty minutes, but subsequently on making some calculations as to his accounts with him, he discovered that instead of owing him that amount, the defendant was, and still is indebted to him in a large balance, and that he has frequently demanded of him a settlement of it, which he had repeatedly refused, and still refuses to make.

But that notwithstanding he had paid him the sum of $3,000, the full amount of the principal of the sum lent to him by the defendant, with the interest upon it, and also through mistake a large amount of money over and above what was actually due him, for which over-payment and for other items hereafter mentioned, the defendant was then and is still indebted to him, he had on the 10th day of November 1869, caused judgment to be entered in the Superior Court for New Castle County, upon the said bond for $3,000, being No. 626 to May Term 1869, which he was advised was fraudulently entered by him, the same having been fully paid as before stated, long before the said judgment was so entered, and that the defendant had caused the said judgment to be entered with the vindictive desire to injure him, saying at that time, and also afterward when he was requested to enter satisfaction as aforesaid, that he would sell him out, and that was the way he would enter satisfaction of it. And that by reason of the entering of it against him, his business which consisted largely of buying real estate, building on it, and selling again, was entirely stopped, and that he became so much embarrassed financially in consequence of it, that he was obliged to assign property to the amount of about $30,000 in value, to certain persons, to sell the same at public sale for the benefit of his creditors, and that in some cases his friends were compelled to give bonds of indemnity against the

judgment to purchasers of his real estate, whilst in others purchasers declined to take title from him, owing to the defendant's refusal to satisfy said lien, and his conduct in the premises; in consequence of which he had sustained damages to the amount of $10,000. And that he had often demanded from the defendant a settlement of the balance due him for the large sums so over-paid, and the entry of satisfaction upon the record of the judgment, but he had always refused to do either, and, therefore, he instituted in the said Superior Court, three suits against the defendant, being Nos. 49, 68, and 143 to May Term 1870, of which No. 68 was afterward discontinued, and that No. 49 is an action of assumpsit on the common counts for the recovery of the large balance due as aforesaid, and No. 143 for the recovery of damages for his failure to satisfy the said judgment.

His cross bill next referred to the original bill of complaint filed by the defendant in the case, and to the prayer of the same for an injunction to restrain the said suits, and the preliminary injunction granted upon it, and to his answer thereto, and asked that they might be made, together with all the papers filed, orders and entries of record made in the cause, a part of his present bill of complaint. It then proceeded to enumerate and state the errors contained, as it alleged, in the original account stated in the defendant's bill of complaint upon which he claimed that their mutual accounts were settled on the day and year in that respect mentioned, in the same mode and manner and in the same words and figures in which they are stated and set forth in his answer to the original bill of complaint. It also further alleged that since the execution and delivery of the judgment bond to the defendant, he had made sundry payments and become entitled to sundry credits on account of the principal and interest of it, amounting on the 2d day of October 1867, to $3,373.14, while the amount then due to the defendant for principal and interest thereon, was $3,318.00, leaving a balance overpaid

by him to the defendant at that time of $56.14. But owing to his ignorance at the time, of the state and condition of their accounts, arising from his misplaced confidence in the defendant, and consequent omission to inspect them, and also to the misrepresentations of the defendant concerning the same, he paid over to him on the 28th day of June 1869, the further sum of $600, by an order in his favor on James Bradford which was duly accepted and paid by him to the defendant. That in addition to the over-payments made by him as before stated, the defendant became further indebted to him for work and labor performed and materials furnished in building and repairing houses, to wit : amount due on contract for houses built in part for the defendant on Reed Street, $1,125.00. Book account against him as per bill rendered and approved and credited by him on the account before referred to as follows : " May 3, 1869, By bill rendered for carpenter's work, $420.85." The price of the house and lot sold him, $1,900. Bill of lumber paid for him to B. Simmons & Co., $16.05. The defendant had also collected and received for his use sundry sums of money from different persons, to wit : May 3, 1869, from Thomas Curley amount due for gable end of house No. 618 Second Street, $76. Interest due from James Lang collected by him June 28, 1869 and not paid or credited to him by the defendant, $21. The defendant was also indebted to him in the following amounts paid by him for the defendant, to wit: March 1, 1869, trunking half of Reed Street row $5.25, and ¼ trunking $6.25. City tax on Second Street houses of the defendant, $7.19 and water rent $5.00. Amount paid for him June 28, 1869, to George O'Niel, $3. The aggregate of which added to the balance due to him from the defendant as before mentioned, on October 2, 1867, to wit : $56.14 made the total amount claimed by him from the defendant $4,241.73, with interest on the respective amounts from their dates, and all of which was fully stated in detail in the bill of particulars filed with the

narr in the said suit, No. 49 to May Term 1870, of the said Superior Court. The prayer was for an account, and that the defendant might be decreed to pay him the amount which should be found to be due, together with his costs in both suits; and that they should be heard together as one cause and one decree had in both according to the rights of the parties respectively, and that the judgment No. 646 to May Term 1869 of the said Superior Court, might be decreed to have been fraudulently entered and, therefore, invalid, and that the defendant and all persons claiming under him, their agents and attorneys might be perpetually enjoined from collecting it by execution or other process, and for further relief, &c.

The answer of the defendant admitted the assignment to him of the Hearn mortgage to secure a bond of $1,450 and interest to accrue thereon, but alleged that it was taken as a credit on general account, for such amount (as understood by him, and he believed, also by the complainant,) as he should be able to collect thereon, but that he had collected upon it on execution process only $1,000, and had, therefore, credited him with that amount from it : and claimed that having learned that the complainant had charged other parties for houses in the same row and of the same kind, $1,800, or less, and the house bought by him being then unfinished, the complainant verbally agreed at the time of the settlement of their accounts undertaken on the 28th day of June 1869, to take $1,800 for it, and for that reason he had credited him with that sum, instead of $1,900, as the price to be paid for it. It further admitted an error in charging him in his account filed with his original bill of complaint, with $2,656 as the proceeds of 166 feet of land at $16 per foot, instead of with two-thirds of the profits on the sale thereof, which would be $885.33$\frac{1}{3}$, with interest from such time as it should have been credited to him by the complainant; but it at the same time claimed that there was another error in it against him inasmuch as he had failed to charge the complainant

46

with two-thirds of the profits on the sale of the Hearn lot, which if estimated at $1,000 would entitle him to a further credit of $143.33, with interest, or if at $1,450 it would entitle him to a further credit of $437.86, with interest. It also admitted that he was due the complainant on the Reed Street houses the sum of $1,100, and the collection from James Lang for account of complainant of $21, but denied all other matters alleged in the bill, and not expressly admitted in it.

The evidence in the case and the decree ordered to be entered in the court below, will sufficiently appear in the following opinion read by the Chancellor in this court.

*Bates, Chancellor.* This case has a long history, one too familiar to counsel to need any detailed statement of it; suffice it to say, that its present position, standing as it does upon the orignal bill and answer, and the cross bill and answer, is equivalent to a reference to the Chancellor of the mutual demands of the parties for the purpose of obtaining a final decree in favor of the one party or the other, for such balance as may be found due to him, and at the same time for such disposal of the suits at law now pending as the result of this investigation may render proper. I proceed then in the first place to state what are the demands made on either side : and first as to the claim of the complainant. The complainant's claim as set forth in the original bill, is two-fold.

1st, He claims an interest in certain lots, the title to which was conveyed to Dillon by deed from Ferris & Garrett, dated August 10th A. D. 1864, alleging that the purchase of these lots was made on the joint account of the parties pursuant to an agreement between them, the evidence of which is a written acknowledgment or declaration purporting to be signed by Dillon and which is in these words :

WILMINGTON, DEL., August A. D. 1864.

This is to certify and show that P. Plunkett of the City

of Wilmington, New Castle County and State of Delaware, and I, Patrick Dillon of the same city and State, purchased from Ferris & Garrett three hundred and seventy-five (375) feet of land fronting on Madison street from Second to Third streets, and in depth ninety-seven (97) feet, Philip Plunkett paying for the same the sum of three thousand dollars ($3000), for which I receive the deed for the same. But I acknowledge and agree for myself and my heirs that said Plunkett is to be paid back his three thousand (3000) dollars with interest, and receive as his share of the profits if any there shall be, two-thirds, and I one-third, and if a loss should be sustained, we are to bear it in the said proportion. In consideration of my receiving the deed, I executed this day a judgment bond for three thousand (3000) dollars for which I hold myself accountable until the property shall be sold, when the proceeds of such sale shall go to pay off said bond. Witness my hand the day and year above written.

(Signed)

PATRICK DILLON.

Wm. Bright.

The complainant claims to be entitled under this agreement, first to the payment out of the proceeds of the real estate, of a balance alleged to remain due on the bond for three thousand dollars and interest; next, to a share, being two-thirds of the net profits of certain parcels of the land which the bill alleges that Dillon has sold, and with regard to which he has not as yet accounted for Plunkett's full share of profits; and lastly, that Dillon shall also account to the complainant for his share under the agreement of the value of a portion of the land alleged to remain still unsold.

2d, The other branch of the complainant's claim embraces four particulars which are wholly unconnected with the real estate transaction. These are, 1st, Certain loans of money alleged to have been made to Dillon to the amount of nine hundred and fifty-four dollars and up-

wards, for which sundry due bills were given. 2d, Twenty-eight dollars due for building stone furnished to Dillon. 3d, Three hundred and forty-one $\frac{77}{100}$ dollars with interest from January 1, 1865, due from Dillon as the surviving partner of the firm of Dillon & Plunkett, for balance of account alleged to be due and unpaid from the firm to complainant. 4th, Ten dollars, amount of·a due bill of Dillon dated Nov. 21, 1868, transferred to and held by the complainant.

Having thus set forth in the bill his original claims against Dillon, the complainant alleges that on the 28th of June 1869, the parties made a settlement between them of all accounts to that date, including the real estate transactions and others, which settlement resulted in a balance due Plunkett of $334.17, for which Dillon gave his note. The complainant, however, does not hold himself to the result of this settlement, but proceeds to allege specifically sundry errors in it. These errors relate chiefly to the proceeds of sale of certain of the lots which had not been included in the settlement. In addition to these the only other error specified was the omission to carry into the settlement the balance of account ($341.77) alleged to be due from Dillon as surviving partner of Dillon & Plunkett. The prayer of the bill is in the alternative depending upon whether the answer should admit or deny the alleged settlement. If the settlement should be admitted by the answer, the bill prays that it be established, but subject to correction of errors in it, and particularly of the errors specified in the bill. But if the settlement should be denied by the answer, then the complainant, having before admitted that he has no proof of the settlement except such as a discovery might afford, prays that Dillon may account at large for the proceeds of the lots sold, for the value of such as may remain unsold, also for all loans or advances in money made to him, also for stove or other merchandise furnished him by complainant, and generally for any other credit to which complainant may be entitled in account with him. This prayer is for an account

comprehending more than the claims alleged in the bill, and to that extent it is ineffectual. The issues in the cause as made by the allegations cannot be enlarged by the prayer so as to admit under the prayer proof of claims not previously alleged. But there is nothing in the evidence in the cause to make this point material.

The answer denies *in toto* that there was any agreement giving Plunkett an interest in the real estate; it alleges that Dillon purchased it on his own account and became under the deed the sole owner; that the $3000, paid to Ferris & Garrett for the purchase money, was borrowed from Plunkett as an ordinary loan upon the security of Dillon's judgment bond for that amount, the bond to be paid as his individual debt, and not as alleged in the bill to be reimbursed out of the proceeds of the real estate as an advance made by Plunkett on joint account. That consequently for all sums of cash paid over by him to Plunkett out of the proceeds of lots sold and for the securities resulting from said sales which had been assigned by him to Plunkett, he claims full credit in any settlement of accounts between them, Plunkett not being as alleged in the bill, entitled to any share or interest in these cash sums or securities, and that he the defendant is entitled to a decree for such balance as may be found due to him upon the settlement of their mutual indebtedness on this basis. With respect to the settlement alleged by the bill to have been made on the 28th of June 1869, showing a balance of $334.17, due the complainant on that day, the answer though relied upon by the bill to prove such a settlement by discovery fails to do so. The complainant by his bill in the 10th paragraph states that with respect to this settlement he "is wholly without proof except by defendant's confession, which it is one purpose of the bill to seek." And the interrogatories relating to this settlement are framed broadly so as to elicit the whole of defendant's knowledge about it, and with the effect of making his entire answer on this point responsive and evidence. No testimony to establish the settlement is adduced by the

complainant, so that the case on this point rests wholly upon the defendant's answer. The answer admits that the complainant on the 28th of June 1869 had prepared a statement of the accounts of the parties which was lying on his office table when the defendant called, that the complainant demanded as a balance due on this account $334.17; that the defendant gave for this balance his due bill, but without any examination of the account, reposing as he then did, full confidence in the complainant; that soon after he discovered by calculations as to their accounts that the complainant was largely indebted to him, and then demanded a correct settlement which was refused. Taking the transaction at Mr. Plunkett's office on the 28th of June 1869, to be as here stated, the answer being made evidence, and the only evidence of it, I must hold it to be of no binding force as a settlement, and that the whole accounts are subject to settlement in this cause as fully as if no account had ever before been stated between them; except in two particulars in which some effect is to be given to the transaction of 28th of June 1869. One is, that the note for $334.17 should stand as a security for any balance of account which upon a just settlement to be made in this cause, might be found due to the complainant. The other is that the credits given in that account to Dillon, are evidence as admissions in the hand writing of Plunkett. I may add however, that this effect of the account stated by Plunkett is of the less consequence, because all the credits given by that account to Dillon were admitted in argument by the complainant's solicitor. One word more as to this alleged settlement of 28th June 1869. Aside from its being unsupported by evidence, it is on its face not entitled to confidence. It is a very loose and careless statement; it was not an account kept by regular entries made from time to time, but appears on Mr. Plunkett's Day Book, where it must have been all entered at one time, and was manifestly made up for the occasion, from data, the source of which does not appear; and besides there have been shown to be many and gross errors in it. The Bill alleges and seeks

correction of a number of errors against the complainant although the statement was made up by himself alone; and these were, as alleged in the answer, and admitted by complainant's solicitor in argument, errors to the amount of about $2500. There is nothing to give the least credit to this statement of accounts except Dillon's acknowledged acquiescence in it, and that is neutralized by the fact with which his acknowledgment is qualified, viz.; that he acquiesced and gave his note without any actual examination, and through a blind confidence. I shall therefore proceed to make a settlement *de novo* between these parties. The first step necessary is to fix the basis of settlement so far as the real estate transactions enter into it, i. e. to determine whether Plunkett was entitled to a share of the profits of the real estate. For if so then Dillon with respect to his payments to Plunkett, of cash and assignment of securities realized from the real estate, is entitled in the accounts only to credit for his own share of the same, and remains still liable to Plunkett with respect to the value or future proceeds of the unsold real estate. But if on the other hand, Plunkett did not hold the alleged interest in the real estate, then Dillon is entitled to full credits for all the assets paid over or transferred by him to Plunkett from sales of the real estate; and with respect to what remains unsold, he holds it as sole owner, free from any claim upon it by Plunkett. Further, the manner in which the $3000 bond is to be dealt with also depends upon the same question; that is, whether it is to be on the theory of a partnership, charged as an advance, on joint account, against the proceeds of the real estate before any division of profit, or whether according to the defendant's claim of the exclusive title to the real estate, the bond is in the settlement, to be charged against him as his individual debt.

We proceed then to the first material inquiry, and the one which formed the main subject of controversy, viz: whether Plunkett is entitled to credit for two-thirds of the net profits of the real estate which has been sold, and

to the like share of the real estate remaining unsold.'
Plunkett's claim to such share rests upon the ground that
he was a joint purchaser with Dillon of the real estate,
for the purpose of re-sale in lots at advanced prices on
joint account; Plunkett to advance the purchase money
as capital, Dillon to give his personal attention and labor,
the profits and losses to be shared in the proportions of
two-thirds by Plunkett and one-third by Dillon; that
Dillon took the title in his name only for the more conve-
nient conveyance of lots to purchasers; that the $3,000
secured by the bond was not a loan to Dillon but an ad-
vance on the joint account, to be repaid out of the gross
sales before any division of profits, in short that the ar-
rangement was a partnership, and Dillon with respect to
the land and its proceeds, a trustee for the partnership.
The evidence of this arrangement chiefly relied upon, is
the alleged written acknowledgment of Dillon of August
1864.   Connected with this paper as evidence tending to
show the arrangement under which the real estate was
purchased there are in proof certain declarations made
by both Dillon and Plunkett.   These declarations, how-
ever, are conflicting and inconclusive.   Several witnesses,
Megarity, Ellen B. Plunkett, and James A. Plunkett, un-
derstood from Dillon's talk with them, that Mr. Plunkett
took an interest in the property; on the other hand
Messrs. Gause, Capelle, and Simmons, in the discussion
of the claims of these parties at the time of the attempted
settlement, as clearly understood Mr. Plunkett's claim to
be, not that he had advanced the $3,000 on a joint pur-
chase, but as a loan to be repaid with interest, and addi-
tionally a share of the profits.   The true view of this
matter is, that in getting at the real nature of the arrange-
ment between these parties, no aid whatever is afforded
by the understanding of third persons as to expressions
carelessly used, and so liable to be misunderstood, as
whether it was a " loan" or an " advance" which was
spoken of, or whether it was two-thirds of the " property"
or only two-thirds of the " proceeds" which Plunkett was

to have. A misunderstanding or misrecollection as to the use of a single word, would in such a case make the whole difference; and hence the conflict in the impressions of two sets of witnesses is easily accounted for without impeaching their veracity. They all had some previous notion about the transaction and readily construed what was said accordingly. The complainant's allegation of a joint purchase therefore must rest upon the memorandum of August 1864. Taking up this memorandum, I am of opinion that it is sufficiently proved. The grounds of this conclusion it is not necessary to detail. Further, it does on its face purport to be an acknowledgment by Dillon that the real estate was purchased by him and Plunkett jointly, and that the $3,000 was an advance on the joint or partnership account and not a loan. Nevertheless the manner in which these parties dealt with the property and all the transactions conclusively show that the arrangement was in fact and substance not a partnership between Plunkett and Dillon in the real estate, but a loan of money by Plunkett made to enable Dillon to purchase the real estate, the same to be repaid with interest and additionally with a share of the profits. And in a conflict between the words and acts of the parties as to what was the real nature and purpose of the transaction, the conclusion to be drawn from their acts must prevail. For plainly words or admissions however direct cannot make a partnership. Whether a particular transaction is in fact a partnership or a loan, must depend, not on what the parties may say or choose to call it, but upon their actual course of dealings in relation to it; and the obligations and responsibilities to which they do in fact hold each other. Now I find it impossible to reconcile with the hypothesis that Plunkett was a joint purchaser of this real estate, the whole course of the transactions and dealings of these parties respecting it; such transactions and dealings as are not at all in dispute. The first and most stubborn obstacle to my construing this transaction as a joint purchase or partnership, is the fact incontestable, that the

47

very object of the purchase of this land, was its division
into lots and the erection on them of buildings prepara-
tory to a sale of the lots with the buildings,.in which ad-
venture, the buildings were of course to form the chief
element of expense and value; and yet confessedly Plunk-
ett was to incur none of the expense of the improvements;
not even so much as the grading of the lots, a share in
which expense was expressly repudiated on his behalf in
the agreement.  It seems hardly conceivable that .these
two men, so shrewd and intelligent as the evidence makes
them, should become joint purchasers and in equity joint
owners of land, bought expressly for the purpose of im-
provement and resale, and yet that one of them should
incur no expense and take no interest in the improvements.
I can well conceive how one of them should lend his
money to effect the purchase by the other upon a stipula-
tion for a portion of the profits in addition to interest,
either for the use of the principal, or in consideration of
some risk to be incurred; but that a joint interest should
be taken in the land exclusive of improvements evidently
contemplated to be immediately put upon it, is too gross
an incongruity to be credited, unless it were shown on the
face of the title papers; whereas, in this case, the title
papers show the direct contrary.   Then concurring to the
same conclusion, viz: that the arrangement, whatever it
might be, was not a joint purchase or partnership, is the
whole course of conduct and dealing of these parties.
The title is made to Dillon alone; Plunkett takes no con-
cern whatever with the real estate, its conditions, or mode,
or terms of disposal; no partnership accounts are kept by
either, or by any one employed by them; the account kept
by Plunkett being the only one in evidence, is an individ-
ual account between him and Dillon, in which the trans-
actions connected with this real estate and others wholly
disconnected with the real estate are intermingled, and in
which it is especially observable that the $3000, which ac-
cording to the case made by the bill of joint purchase, was
to be paid only out of the proceeds of sale as they should

be realized after sales made, is yet credited with two cash payments not received from the property, one of $100, and the other of $300, made in the very month of the purchase, August 1864. So, later, in the same account, are other large credits given to Dillon, for payments not realized from the real estate, as credits which could apply to nothing but this bond, that being the sole debt due Plunkett; such as the assignment of Bradford's note credited in the account, and upon the evidence the same may be said of the Curley note, the two amounting to over $1200. Then again, Plunkett contracts to buy one of the houses built by Dillon on the land upon the same footing precisely with other purchasers, strangers to all these transactions, and without the recognition of any joint interest held by him in the premises. Now it is true that some of the features of the case taken alone, might be reconciled with the existence of a joint interest in the land, but the bearing and force of the whole together is strongly against it; so much so, as to leave a fixed conviction, notwithstanding the terms of the writing of August 1864, that there was no joint purchase nor any partnership; that the $3000 secured by the bond, was not an advance upon the joint account, but a loan to Dillon, made to enable him to purchase the real estate; with a stipulation that in addition to its repayment with interest, Plunkett should receive two-thirds of the profits upon the land; the profits to accrue from the improvements. Of course I do not here decide whether or not Plunkett would have been liable as a partner to third persons, but only what are the real relations of the parties and their rights and obligations as between themselves.

Then arises the question, whether the stipulations for a share of profits, in addition to interest on the loan is such as a Court of Equity ought to enforce. Several distinct objections were taken to it. First, it is objected that the stipulation is usurious. This objection when made at a former stage of the cause, on the motion to dissolve the injunction for want of equity in the bill, was overruled,

because on such a motion the Court was bound to assume as true the allegation of the bill that the purchase of the real estate was joint, and that the $3000 was not a loan but an advance of capital on the joint or partnership account; but upon the present hearing, which is on the bill, answer and proofs, the transaction is to be treated according to its real nature, as that shall appear upon the evidence; and in my opinion already fully expressed, the real transaction was not an advance of capital, but a loan of money. This aspect of the case opens for consideration the question of usury, which, on the motion to dissolve, was closed by the allegations of the bill. It does not, however, necessarily follow, that because the $3000 was a loan the stipulation for a share of profits is usurious. It is an acknowledged exception to the statute, that where the principal is put at risk, more than the legal rate of interest may be received; the excess, in such case, being allowed as a consideration of the risk of the principal in addition to the interest which is the consideration for the forbearance of the debt. Such are loans upon bottomry and respondentia, and post obit bonds; and the principle may be considered a general one, not limited to these special cases, which are the ordinary instances of such loans. But it must be here particularly observed, that the risk of principal to come within this exception to the statute, must be a substantial one, i. e. it must be such a risk as a prudent man could not be supposed to take for legal interest only. Such therefore as must have formed a real ingredient in the contract and the true consideration for the additional profit stipulated for; being clearly and beyond doubt not colorable or intended only as a cover for exacting more than the legal rate of interest for the mere use of the principal. And in determining whether the risk be substantial or only colorable, the transaction will be subjected to the most searching scrutiny, and will be dealt with according to its real nature and purpose without respect to the form or words in which it may be clothed, for by no contrivance or device can the Statute

of Usury be evaded. On no point have the Courts expressed themselves with greater, if with equal emphasis. "Courts regard the substance of the transaction" says Lord Hardwicke, "and not the words of contracts." *Chesterfield v. Jansen*, 1 *Wil*. 286. Again, Lord Mansfield in *Lowe v. Walker*, *Doug*. 736, says, "the only question in all cases like the present is what is the real substance of the transaction, and not what is the color and form." C. J. Marshall, in *Scott v. Lloyd*, 9 *Peters S. C. R.* 447, says that "the Courts have perceived the necessity of disregarding the form and examining into the real nature of the transaction. If that be in fact a loan, no shift or device will protect it." The question there was whether under the form of a sale of an annuity a usurious loan was really intended. Upon the distinction between substantial and colorable risks, the leading case uniformly recognized and followed is *Chesterfield v. Jansen*, 2 *Vesey Sr.* 125; 1 *Atk.* 301. 1 *Wilson* 286. That case was heard before Lord Hardwicke assisted by the Master of the Rolls, and also by several of the Law Judges; and was most elaborately argued and considered. On the precise point now before us Lord Hardwicke thus lays down the rule, 2 *Vesey Sr.* (154) " if the contingency goes to both principal and interest, and there is a higher rate than the law allows, regard is had whether a *bona fide* risk is created by the contingency, or whether only colorable, for if so, Courts of Law hold it contrary to the statute, &c. But when the contingency has extended to principal and interest both, and not a colorable only, but a fair and substantial risk is created of the whole, it takes it out of the Statute ; though called a loan it is considered a bargain or chance &c. The other judges express themselves to the same effect. Mr. Justice Burnett says, " The intent of the bargain is the material thing ; if that was borrowing the money, it is within the Statute whatever colorable contingency is inserted; and this is the sense of all the resolutions in the several cases. But where the principal was fairly and truly put in hazard, and such as none would run for the interest the law allows,

there is no case where it has been held within the Statute. The slightness or reality of the risk seems to be the only rule directing the judgment of the Court." Illustrations of what are colorable risks are afforded by adjudged cases in great numbers. The older cases are collected in *Chesterfield vs. Jansen*, and in *Comyn on Usury*, 5 *Law Lib.* (32.) As where money is loaned for more than legal interest the principal to be payable in six months if the borrower, or his son, or any one else being in fair health should be then living. *Mason vs. Abdy. Cowp.* 125. 3 *Salk.* 390 and *Carth.* 67. *Bulton vs. Downham*, *Cro. El.* 643. *Briton's Case.* 5. *Co.* 70. *Kelly on Usury* 75 *L. L.* (61) puts this illustration of the difference between substantial and colorable risks, drawn from *Bedingfield vs. Ashley*, *Cro. El.* 741. "The chance of five daughters being alive at the distance of ten years, was held sufficient risk; for where one agreed with another in consideration of £100 paid down, that he would pay £80 a piece to each of the five daughters that should be living at the end of ten years, the Court held it not usurious, and said, "if it had been that he should pay at the end of one or two years £300, if any of said children were alive, that had been usury, for in all probability one of them would continue to be alive for so short a time, but in ten years are many alterations." A common mode of seeking to evade the statute by the creation of colorable risks, has been by the sale of annuities held by the borrower during his lifetime, the sale being for such a sum as would make the annuity while received equal to much more than legal interest on the sum paid for it, the annuity being at the same time made redeemable at the expiration of a limited period, by the repayment of the sum advanced upon it. Now suppose the annuitant to be living, and to redeem the annuity, the effect was precisely that of a loan of the amount advanced at an interest equal to the annuity, subject to the risk of the borrower's death meanwhile. In *Lawly vs. Hooper*, 3 *Atk.* 278, Lord Hardwicke held such a risk, although the period of redemption was indefinite, to be colorable,

because the lender might insure the life of the borrower although such business would involve some risk. In *Richards vs. Brown, Cowp.* 270, where the money was advanced at usurious rates on the assignment of an annuity which at the end of three months was redeemed and converted into a loan, Lord Mansfield after looking into the cases, held that the risk the lender was under of the borrowers's dying within the three months was not sufficient to take the case out of the statute. "The borrower," he says, "was a hale young man, and therefore, we are of opinion there was no substantial risk to take this case out of the statute."

In the case before us the question of usury turns upon the operation of that clause in the memorandum of August 1864, which provides that Plunkett should receive the $3000, advanced by him with interest, out of the proceeds of sale; also, that if a loss were sustained the parties should bear it in the same proportion in which they were to share the profits, i. e. Plunkett two thirds, and Dillon one third. I assume that the effect of this provision, as was argued for the complainant, did make the $3000 payable only out of the proceeds of the lots, and rendered Plunkett liable for a share of losses accruing from the purchase and sale of the lots. The effect was to subject his principal to the risk of whatever depreciation in value the lots might possibly sustain before their improvement and sale. Then the decisive question is, was this a substantial or only a nominal and colorable risk? Four reasons which I propose to state distinctly, have concurred to bring me to the conclusion that this was only a colorable risk.

First then, there was in point of fact no possibility of a depreciation in these lots. The purchase was of a large lot or tract of land situated in an improving part of Wilmington a city advancing rapidly in population, wealth and business. This tract was to be divided into city lots for immediate improvement and sale when improved. This was a process morally certain to enhance the value of the lots. The result demonstrates this. Dillon gave for the whole tract

$8 per foot, on the 10th August 1864. Eight days afterward, on the 18th of August he sold to Wm. Dougherty 16 feet at $12 per foot; and on the same day to Thomas Curley 32 feet at $12 per foot, an advance of fifty per cent. upon the cost; a profit accruing from the mere division of the larger tract into smaller lots, and the prospect of the erection of buildings on the remaining lots. Two years afterward in July 1866, Dillon sold to Philip C. Hearn in one body 101 ft. 8 inches of this land unimproved at a fraction over $14 per foot, being an advance of 75 per cent. upon the cost. Thus much as to the lots sold unimproved. With respect to the improved lots which Dillon sold for gross sums, a large body of estimates made by witnesses were submitted by the complainant, the result of which was to fix the valuation of the improved lots at a considerable advance, the estimates on the lots ranging from $20 to $30 per foot. Altogether the sales of the unimproved lots and the valuation upon the improved lots lead to this conclusion; that the advance in value of the lots was not in the least degree speculative, but was morally certain to result from the measures contemplated in the purchase, that there was no real risk of depreciation in the lots; that whatever losses might be incurred by Dillon in the improvements, none could spring from the lots. To apply the tests so well put in *Chesterfield v. Jansen,* the depreciation of these lots before they could be improved and sold to the loss of Plunkett's principal of $3000, was not such a real and substantial risk as must be supposed to have entered into the serious contemplation of the parties, to have formed a real ingredient in the contract, and the true consideration for the concession of two thirds of the profits over and above interest.

In the second place, Mr. Plunkett evidently meant to take no risk in this business. He was careful to stake nothing upon the improvements to which the only hazard of losses could attach. He was content to share the profits in the land, which were certain, and in doing so to share also the chance of loss on the land alone, which is clearly

nominal as the profit was certain. Just at the point where the question of profit and loss became one of substance he stopped. It is certain that help to build houses as well as to buy the land must have been acceptable to Dillon, and it is quite as certain that it would have been · given to him by the formation of a real and substantial partnership in the whole enterprise, instead of a mere loan for the purchase of the land but for the consideration that in the building operations there were real risks, while in the value of the land there were none worth consideration.

Then we come to a third feature of the case, which strongly indicates that the memorandum of August 1864 was colorable, that is, its purporting to set forth a joint purchase or partnership, contrary to what the acts and transactions of these parties demonstrate to have been the real arrangement between them. This inconsistency between the memorandum and what the evidence discloses as the real nature of the transaction, can only be explained by treating it as a veil to cover, under the guise of a partnership, advance of capital, what was in fact and in substance a loan of money; and it is pregnant evidence that the provision inserted in it of risk on the resale of lots, which as we have seen was in fact but nominal, was in intent colorable.

And now a last fact concurring with those before stated against the assumption that the share of profits was in consideration of any risk to Mr. Plunkett's capital, is his own statement of the ground on which he claimed these profits made to Mr. Gause at the time of the attempted settlement. He claimed that " on account of his having furnished this money ($3000.) to Dillon, he was to have a certain share of the profits, two thirds." These are his words. " The claim to profits was not here made for risk, but for the accommodation in raising the money.

There is a general consideration that weighs very strongly with me in treating this as an usurious arrangement. It is that the case is in a Court of Equity where

48

such a decision operates less severely upon the complainant. In a Court of Law usury operates as a forfeiture of the debt, and subjects the lender additionally to the penalties of the Statute. In this Court the whole effect of adjudging a loan to be usurious is to relieve the borrower from the exaction of more than lawful interest. The lender is permitted to receive his debt with the interest. In a Court of Law where such consequences are to follow, the onus may well be upon the borrower to establish a clear case of usury; but in a Court of Equity, where the lender is at all events to get his money with interest, he should be justly held to satisfy clearly the conscience of the Court in allowing him a larger exaction. Here precisely is the ground of my conclusion : I am not satisfied that the mere chance of the immediate depreciation of these lots, while under the very process of improvement, was a sufficient risk to Plunkett's principal to raise an adequate consideration for the larger exaction of profits—two-thirds—in addition to the interest, and thus to take the case out of the statute.

Leaving now the question of usury, we come to another fatal objection to Plunkett's claim to a share of the profits ; that is, that the claim is, under the circumstances, grossly inequitable, such as even were it not usurious, a Court of Equity will refuse to enforce. What is this claim ? It is to a share of profits for the creation of which, Mr. Plunkett has neither risked his money, nor given his personal labor. The utmost extent of his connection with this enterprise was to loan Dillon $3000, to enable him to purchase the land, the repayment of which money with legal interest was secured to him to his satisfaction at least. This is not like the case of a partner who upon an advance of capital to his firm may in addition to his advance with its interest, justly receive a share of profits, because there the partner's capital is at substantial risk, and he himself additionally is liable for the partnership debts. So here, if Mr. Plunkett had become a *bona fide* partner in the whole enterprise of purchasing, improving

and selling the land, thus subjecting his capital to real risk, and assuming the substantial liabilities of a partnership, his claim to a share of profits as well as interest on capital would be equitable. But instead of a partner he was plainly but a money lender, and certainly if one person who lends his money at interest to help commence an enterprise, may without sharing its real hazards, equitably exact a portion of the anticipated profits, another person may with equal equity upon a further loan to help prosecute the enterprise to completion, exact the residue of the profits; thus between them leaving as a return for the labor and skill of the adventurer all the risk and none of the profits. The practical effect of such arrangements is to place labor in a condition of absolute servitude to capital, and they are not only inequitable in principle, but if permitted, would be ruinous in the general results. But not only is Mr. Plunkett's claim to any share of the profits inequitable in principle, but that it is in degree grossly so, will appear when we observe what is the share here claimed; this is not merely some portion of the profits, not even an equal portion; but two-thirds; the effect of which is, that the lender who risks nothing and has no labor, and is in any event to have the full legal compensation for the use of his money; takes nearly all the profits, leaving but a small portion to him who carries all the real risks of the enterprise and bestows all the labor. The practical result of the whole transaction upon the complainant's theory and its gross inequality, is strongly illustrated by the claim actually made in argument upon figuring up. Upon a rough calculation by the complainant's counsel, the claim made for him on account of profits was this : Upon the basis of the highest estimates of the advanced value of the land $3379.80 : Upon the basis of the average estimates of the advanced value of the land, $2988.35.—The effect therefore was to double the complainant's principal in addition to giving him legal interest, and that upon a transaction which was closed in about five years.

Now with respect to the principles upon which this court deals with what are usually termed hard and unconscionable bargains; they have been settled so clearly and authoritatively as to need little more than a statement of them. The rule is this; where the contract has been already executed, or the party having the advantage under it can enforce it at law without the aid of a court of Equity, this court will not interfere to set the contract aside, or to restrain a party seeking his legal remedy under it, on the mere ground that the contract is hard or unreasonable; where there has been no fraud or mistake, or the party hardly dealt with is not mentally incompetent, or of a class which is under the protection of Courts of Equity, such as heirs dealing with expectancies. But on the other hand, where a hard contract remains yet executory, and the party not being able to effect his unconscientious advantage at law, seeks the aid of a Court of Equity, it will not help him. In such case, though there were no fraud nor mistake, and though the party hardly dealt by, was not incompetent nor a special subject of the court's protection, such as an heir expectant; still the court will decline to interfere. The rule cannot be better stated than by a very great authority, Lord Hardwicke in *Barnardiston vs. Lingood* 2 *Atk.* 134, where he says, "In the case of a hard bargain, where it is not absolutely executed, but executory only, the constant rule of the court is not to carry it into execution." The principle on which this rule rests is, that a Court of Equity will not be made the instrument of hard and unconscientious dealing. If the party has already secured his advantage through the execution of the contract, or if he can secure it at law, this court will not, unless on the special ground, just referred to, molest him; but at the same time will not help him. The present case affords an apt illustration of the principle—Plunkett has invoked the aid of this court by a decree for a discovery and an account to enable him to recover the share of profits claimed in addition to his principal and interest.

The court then will look to see whether he is seeking a hard advantage against equity and good conscience, and if so, will not lend itself to such an object. This mode of dealing with executory contracts has received its most common application in cases of bills for specific performance. In a case of that class, *Godwin vs. Collins, ante* 28, it was very fully considered by this court, and the principles then applied being the same just stated, were approved by the Court of Errors and Appeals. This present bill so far as it seeks to have the stipulation for a share of the profits carried into effect, is in substance a proceeding for specific performance, and is subject to the same principles. But at all events the doctrine that the court will not enforce an unconscientious contract while it remains executory, is a universal one applying as well to loans as to contracts for the sale of land. In *Lawley vs. Hooper*, 3 *Atk.* 278, where an annuity had been purchased on very hard terms, and the main question was whether the transaction was not a usurious loan under cover of a sale, Lord Hardwicke after considering that question, added, " but I do not think I am under any absolute necessity to determine this point, for I am of opinion that this is such an agreement as this court ought not to suffer to stand, taking it as an absolute sale." In that case the court considering that advantage had been taken of a party's distress, went so far as to set aside the sale on his application. In *Jestons vs. Brooks, Cowp.* 793, the defendant wishing to purchase some goods and not having the money, the plaintiff loaned it to him upon the defendant's note payable on demand, with a stipulation that he should have half the net profits upon a resale of the goods, over and above the note. The plaintiff by making immediate demand entitled himself to interest, and thus he claimed both debt and interest and additionally a share of the profits of the transaction, without incurring any risk as a partner in it. That case is essentially like the present one as it is now developed by the whole evidence, though different from that made by the

bill, on the point of risk, as I considered it on the motion to dissolve the injunction for want of equity in the bill. The court in *Jestons vs. Brooks*, held the contract to be not only usurious, but also an unconscionable bargain, such as even a court of law would not enforce in that action, which was for money had and received; it being as Lord Mansfield said " analagous to a bill in Equity. After considering the question of usury, Lord Mansfield proceeds to say, " suppose it was not strictly usurious, shall a man in an action for money had and received, which is an equitable action and founded in conscience, recover an unreasonable and exorbitant demand as this is? most clearly he shall not."

The objection now under consideration, that is the gross inequitableness of the claim to profits in addition to interest, is fatal whatever view we may take of the arrangement between these parties.    Even treating them as joint purchasers upon the theory of the bill, and that the $3000 was an advance of purchase money, the stipulation for almost the whole of the profits on the lots received, without either risk or labor to be incurred by Mr. Plunkett or anything done by him but advance his money at legal interest, was an unreasonable and exorbitant arrangement, which although if executed, a Court of Equity might not disturb, yet it will decline to enforce.

There is a broad and fundamental maxim of Equity which reaches into this case, and which is alone decisive of it; that is, that he who seeks equity shall do equity. Mr. Plunkett has sought the interposition of this court to effect a settlement of these transactions even to the extent of withdrawing the controversy from the Courts of Law. In such case the course of the Court is to adjust between the parties all the equities arising out of their transactions, requiring that the complainant do, as well as receive equity.  It is precisely on this principle that when a borrower of money on usurious interest comes into a Court of Equity for relief against the lender, it will oblige him to repay the debt with lawful interest,

upon being relieved of the usurious excess. So here, upon the like principle, the Courts will oblige Mr. Plunkett to relax an unconscientious claim to a share of the profits, even supposing such share to have been stipulated for, at the same time decreeing the repayment of the money loaned by him with the lawful interest. After much and anxious reflection upon the whole case, I am decidedly of opinion that this course and no other, will effect equal and exact justice between these parties.

After the announcement of the opinion of the Chancellor and of the allowances and disallowances made by him in the accounts of the parties, the counsel agreed upon a statement based upon the decision, and showing in conformity therewith a balance due from Plunkett to Dillon of $4626.10, for which a decree was entered under the cross bill; also a decree perpetually enjoining the collection of the $3000 judgment; also for the canceling and delivery up of the due bill of June 28, 1869 for $334.17, and for costs. Upon the original bill a decree was entered dismissing the bill with costs and dissolving the injunction heretofore issued against the suits at law. From this decree each party appealed and both cases now came up for a hearing at one and the same time as one appeal.

*Whiteley*, for the complainant in the first case. The whole case depended on the following questions, whether it was a partnership between the parties, or a loan of money to the amount of three thousand dollars by Plunkett to Dillon of a usurious character, and if neither, was it such an inequitable and unconscionable contract for a loan of money, as a court of equity would not enforce. It was a partnership in which Plunkett was to furnish the money or capital and Dillon the labor, and which in these days was no uncommon union in such enterprises or speculations. The parties were both shrewd business men in their line of operations, and were equally capable of making and carrying out such a contract. The contract or agreement is evidenced by the written acknowledgment

signed by Dillon and delivered to Plunkett on the 10th of
August 1864, and it is as clear as it is brief, and yet, it is
as full and complete as could be required ; and does it not
clearly import and constitute a partnership between them
for the purpose expressly indicated in it ?   The great test
of the existence of a partnership between two or more
persons is their participation both in its profits and its
losses, which is expressly stated and stipulated in this
agreement between the parties to engage in the undertak-
ing declared in the paper, and on the terms expressed in
it.    Besides, the three  thousand dollars advanced  by
Plunkett to buy the land, and the judgment bond given
by Dillon to him for it, was to be paid out of the proceeds
of the  sale of it in lots; and it was  proved that Dillon
had stated that the deed was made to him alone for it,
because  Plunkett wished to save himself and wife the
trouble of making and acknowledging deeds for the lots
when sold to purchasers.

As the bond was payable out of the proceeds of the
sales of the lots, Plunkett could have been enjoined from
proceeding to enter judgment upon it and to execute and
collect it, until sufficient money had been realized from
the sale of them to pay it, and as evidence that he so con-
sidered it, he did not have judgment entered upon it,
until the month of November 1869, five years and five
months after it was executed and delivered by Dillon, on
the same day that he signed and delivered to him his
written statement and acknowledgment of the agreement
between them in regard to the purchase of the land and
the purpose of it ; and, in point of fact, Plunkett did not
have judgment entered upon it, until after Dillon had
denied the agreement, repudiated the partnership and
refused to recognize his right to any portion of the profits
arising from the sale of the lots.   But that was a fraudu-
lent and dishonest after-thought on the part of Dillon,
because the bond by its terms was not payable in any
event, until one year after the date of it, and was after that
time, payable only out of the proceeds of the sale of the

property; and yet in two days after it was given, Dillon paid three hundred dollars on it to Plunkett, as well as numerous other, though smaller payments made from time to time within the year and before the maturity of it, and between that time and the year 1869, (when for the first time he resolved upon the desperate expedient of denying the agreement and repudiating the partnership,) had actually paid Plunkett out of the proceeds of the sale of the lots between six thousand seven hundred and seven thousand dollars, or more than double the amount then due on the bond with the interest added, and more than one-half of which must have been paid by him on account of Plunkett's share of the profits under their agreement of copartnership in the business. The reason of his making the payments referred to before the bond was payable was obvious. It was because by the terms of the agreement, the principal and interest of the bond as soon as it became payable, were first of all things to be paid out of the proceeds of the sale of the property, and, of course, until that debt was extinguished, it would absorb all the profits with Dillon's third part of them; and, therefore, it was his interest to pay it as speedily as possible.

Plunkett could not have made the bond, qualified as it was by the agreement between them, a generel lien on Dillon's property, or on any other property, real or personal of his, except his interest and estate in the land purchased with the money for which it was given. Therefore, if their title to the property purchased by them with the money had failed, Plunkett would have had no other recourse whatever for the recovery of it or any part of it. Had he attempted to recover it out of any other property of Dillon before the latter had deliberately determined to repudiate the agreement and connection between them in the undertaking, he would have been liable to be perpetually enjoined by the Court of Chancery from proceeding to do it. Nor could he have proceeded to collect it even, out of Dillon's share of the property in question, until he had sold enough of the property to pay it. And therein

consisted the risk and hazard of the undertaking upon the part of Plunkett, and which with the terms and effect of the agreement clearly constituted it a contract of partnership between them in relation to the matter. *Sto. on Partn. sec.* 19. *Col. on Partn. secs.* 3, 19, *sec.* 245 *note* 1. *Ferrel vs. Richards*, 1 *Nott & McCord*, 20. *Glover v. Tuck*, 24 *Wend.* 153. *Williams v. Henshaw*, 11 *Pick.* 83. It was also a fair and reasonable partnership contract and undertaking entered into by parties equally experienced and capable of making such an agreement without any allegation of fraud or deception practiced, or of undue advantage taken on either side. The doctrine of unconscionableness as a ground for impeaching the justice and equity of a contract, was a dangerous doctrine, and no case could be found in which it had been recognized without proof of fraud or bad faith, or some overreaching or undue advantage taken of the weakness and inexperience, or the extreme pecuniary necessity of a victimized party drawn artfully or designedly by the other side into an inequitable or unconscionable contract, so far as to decline even to enforce the agreement when assailed or impugned on such a ground. The leading case of *Chesterfield v. Jansen*, 1 *Atk.* 351, stands alone upon that ground, and no case goes any further than that.

As to the objection on the score of usury, the principle is well settled that where the partnership is *bona fide*, and not feigned as a contrivance to disguise and conceal a contract for the loan of money at a usurious rate of interest, even although one of the partners may covenant that he will bear all the losses of the partnership, and pay the other, as his share of the profits, a certain sum which would amount to more than the legal rate of interest on that other's share in the capital, it will constitute a partnership, and not a usurious loan of money. In this case, however, which is still much stronger than the case just stated, Plunkett was to pay two thirds of all the losses, if any, as well as receive two thirds of the profits. 3 *Pars. on Contr.* 143. *Enderley v. Gilpin.* 5 *Barn. & Ald.* 314.

*Bates*, for the respondent. There were mistakes in the account of Plunkett to the aggregate amount of twenty five hundred dollars, and yet every one of them was in his own favor; and that was sufficient to show the weight and credit to which it was entitled in the consideration of the case. But the paper relied on to establish the partnership agreement, had not been sufficiently proved. It bore no date more precise or definite than the month of August 1864, although it was said to have been made and delivered on the same day with the judgment bond for the $3000. It was attested by William Bright, but whilst he had admitted the signature to be his on his examination as a witness, he had no recollection of the paper or of his signing it, and never heard until this suit had originated, that Plunkett had any interest whatever in the purchase of the land in question, and had never supposed that any other person than Dillon was concerned in it, although he made the bargain and the sale of it to him as the agent of Ferris and Garrett. Why under such circumstances was it not proved at least; by the person who drew it, for it was not in the handwriting of either Plunkett or Dillon? None of the witnesses examined could positively say that the signature to it purporting to be Dillon's was in his handwriting. But taking it for all it could be worth, what was the nature and character of it as an agreement? It was not a contract of copartnership. The best rule to guide one in determining or ascertaining the meaning and intention of the parties to it, is to be derived from the course of conduct pursued by the parties themselves with reference to each other in relation to the business, which will have the effect in a court of equity, at least, to modify and vary even express articles of copartnership, when such a course of conduct continued for a sufficient length of time, is clearly inconsistent with such articles. As for instance, where a party though nominally a partner, has never acted or taken any part whatever in the management or the transaction of the business; as between themselves alone, and when there is no question of their liability as to other

persons, such a party was not to be considered a partner, although expressly named as a partner in the most formal articles of copartnership. *Col. on Partn. sec.* 209, 210, 257. *Jeston v. Brooks, Cowp.* 793. *Geddes v. Wallace,* 2 *Bligh* 270. But in this agreement the term partnership did not appear, nor was a partnership even intimated in it in words, nor did either of the parties intend or understand it to be a partnership formed between them for the purpose of either buying or selling the land; while it clearly and conclusively appeared from all the evidence in the case, that Plunkett never took any part in the management or the transaction of the business, or had anything whatever to do with it except to loan Dillon the $3000 to buy the land, which was itself simply the inception of the undertaking and preceded any transactions for the division, improvement and sale of the property. Neither Plunkett or Dillon ever considered or called it a partnership, and no person ever heard of it as such, until about the time the bill of complaint was filed in this case.

But if it was not a partnership, it was then merely a loan of money; and if so, was it usurious? And the test of that would be, was it attended with real and *bona fide* hazard, or serious risk and danger of loss by reason of the terms and conditions on which it was lent? *Com. on Usury* 5 *Law Libr.* 22, 30. *Leigh's N. P.* 483. *Chesterfield v. Jansen,* 1 *Atk.* 301. *Lowe v. Walker, Doug.* 736. *Scott v. Loyd,* 9 *Pet.* 497. Plunkett could at any time have entered judgment on his bond, but without suing out execution upon it, and thus obtained a lien on all the land purchased and with the division of it into city lots and the houses erected and other improvements made upon them, to the expense of which he contributed, and was to contribute, not one cent by the terms of the agreement, there could in no event have been any danger of its depreciation in value below the amount of his bond and the interest annually accruing on it. There was no way in which any losses sustained by Dillon in making the improvements upon the property, could have been recovered from

Plunkett; and his books show that he never gave Dillon credit for any of his expenses on account of those improvements, which he ought to have done, if they were partners in the business of improving and selling the lots. But where the contract for a loan of money is in the form, or under the semblance or cover of a partnership between the borrower and lender, and the former contracts to pay legal interest for the use of it, and also a certain proportion of the profits of the business, it is usurious and void, although the latter may be liable as a partner to others for the debts incurred by the former in the course of the business; because, if he is so compelled to pay, he still has his remedy over against the borrower, and, therefore, runs no ultimate risk, except that of the borrower's insolvency, which is not a sufficient risk in such a case to save the loan from the taint of usury. 3 *Pars. on Contr.* 143. *Jeston v. Brooks, Cowp.* 793. *Morse v. Wilson,* 4 *T. R.* 353. But whether it was in point of fact, a loan merely, or a partnership, it was a hard and unconscionable contract which a court of equity would not enforce under all the facts and circumstances disclosed in the case.

*Gordon,* for the respondent. The bill was for the specific performance of a contract in regard to the purchase and sale of real estate, but which the court would not enforce, unless the contract had been proved to be clear, definite and unequivocal in all its terms, or not uncertain, or ambiguous, or not made out by satisfactory proof, and unless the acts done were also proved to be clear and definite, and were referable exclusively to the contract. 2 *Sto. Eq. Jur.* sec. 764. The difference between a complainant seeking and a respondent resisting the specific performance of a contract, is distinct and marked, because it is a matter, not of absolute right in the party, but of sound discretion in the court, and, therefore, it requires less to defeat than to maintain a bill of that kind; and to be so decreed the agreement must be certain, fair and just in all its parts; nor will the specific execution of a hard and

unconscionable bargain be decreed, nor where such a decree would be inequitable under all the circumstances. 2 *Sto. Eq. Jur. sec.* 769.  The contract was uncertain, and if signed by Dillon, which was itself uncertain, it was signed by him alone, and was void for want of mutuality : for Plunkett was safe from loss in any event, and with the exception of the loan of the $3000 to Dillon, he was to contribute positively nothing, either in money, time or attention to any part of the business or undertaking, while he was to have and receive in addition to the money lent with six per cent. interest on it, which was first to be paid out of the proceeds of the sales of the land bought with it, two-thirds of the net profits, if any, on the sale of the lots alone per foot at their enhanced value by reason of the expensive improvements to be made upon them at the sole cost and risk of Dillon.  Such a one-sided contract so unequal in its terms, in its chances of profit and loss, and in the expenses, outlays, labor, risk and liabilities of the re-spective parties to it, could not have been a genuine and *bona fide* contract of partnership between two men of ordinary reason and judgment, or any thing but a cover and con-trivance to conceal the real object and purpose of it, which simply was a loan of that amount of money on a positive certainty and without the slightest risk or hazard as to the repayment of it to him with six per cent. interest, and with two-thirds of the profits on the sale of the lots added to it, which was equally certain, and which would beyond all question, make it a usurious contract for the loan of that sum of money.   And the fact that Plunkett was from the first in the exclusive possession of the only written evidence of the agreement, and studiously concealed the knowledge of it from all other persons, and never spoke of it even to the arbitrators, Mr. Gause and others, when they met by the mutual consent and choice of himself and Dillon to compare and adjust their accounts prior to the commencement of this suit, although he did then say to them that he was to have two-thirds of the profits on the sale of the land, but without producing the written

acknowledgment, or saying anything about it, although it was then in his possession, all went far to sustain and establish the object and design of it as he had just stated it. Besides, his books showed no such thing as a partnership account between them. But could any one suppose that such would have been the case, if a partnership of such value and importance and involving the sale of so many houses and lots in the city of Wilmington, had a partnership in fact really existed for so many years between them? On the contrary, all the credits entered by him, were entered as credits simply on the bond for the loan of the $3000, which clearly showed that he considered himself all the while, as the creditor merely, and not the partner of Dillon in the business.

And as further evidence that such was the only view and understanding which he entertained of the relation existing between him and Dillon in connection with the business, it would be found that he had even charged him with the internal revenue stamps affixed to his bond, to the amount of $7.00. While he had credited him on the bond with the whole amount received from him on the sale of the first lot a few days after it was given; also with the $100 refunded to him by Mr. Bright, in a few days afterward; also with the $384 received from him a few days later; and also with other moneys received from him on subsequent sales of the lots amounting in the aggregate in the month of April 1866, to within $800 of the whole amount of principal and interest then due on the bond; and all of which were credited upon it, but not one of them entered in any partnership account between them, for the simple reason that none had ever been opened by him. Was that consistent with the idea that he then considered himself a partner, or as anything but a simple creditor of Dillon in the transactions stated? But they also clearly showed that Dillon on the other hand considered himself as simply his debtor, and not his partner in the business, and hence the eagerness exhibited by him, notwithstanding his pressing need of money all the while,

to carry on the improvements at his sole expense, to pay the money borrowed of him as soon as possible. But if it was a contract of partnership, and not a usurious loan of money in disguise, as he believed it to be, he had already said enough, he thought, to show that it was so unequal and unfair in its terms, and exhibited such a grasping and avaricious spirit on the part of the complainant, or that it was, in other words, so grossly inequitable on its face, and such a hard and unconscionable contract even of that kind, that this court, like the court below, in the exercise of a sound discretion, will refuse to enforce it specifically. *Jeston v. Brooks, Cowp.* 793.

*Patterson,* for the complainant. The bond for the $3000 advanced to pay for the land, and the only capital with which the partnership commenced its business, was executed and delivered on the 10th of August 1864, by Dillon to Plunkett, and the judgment was not entered upon it until the 10th of November 1869, just five years and three months afterward. In the meantime most of the lots had been sold by Dillon without his ever having returned to Plunkett any account of the sale of them, although he had made him from time to time sundry payments on account of the sale of them, amounting in the aggregate on that day to far more than the amount due him on the bond and its interest simply. He had however, before that day deliberately denied and repudiated the agreement between them, and falsely and fraudulently alleged, as he had done under his oath both in his answer to the original bill, and in the cross bill filed by him, that he bought the land solely on his own account and for himself, having simply borrowed the money of Plunkett to pay for it, and that Plunkett had no further interest or concern in it, than that it was agreed between them that he was to be repaid the money borrowed of him with lawful interest, out of the proceeds of the sale of it when sold ; and that he had merely given him his judgment bond, and nothing more, to secure the repayment of

the loan with interest. His written acknowledgment, however', signed and given by him at the same time the judgment bond for $3000 was delivered to Plunkett, stating the agreement between them and the terms of it, had been proved, and was now before the court. And the original bill of complaint alleges on the faith and authority of it that the land mentioned and described in it, was to be sold by Dillon, for the joint benefit of the parties, either as partnership, or trust property. He was to sell and account to Plunkett for his share of the profits, if any, and if it resulted in a loss, Plunkett was to bear it in the same proportion. It was a legal contract and contained all the elements of a legal contract; and mutuality in its broadest sense, for it consists both of mutual considerations and mutual obligations. It also constituted a resulting trust to Plunkett who advanced the money to pay for the land. *Brown on Frauds. sec.* 84. *Newell v. Morgan,* 2 *Harr.* 225. There may be a partnership in buying and selling real estate, either in the land itself or in the profits' of the business. *Col. on Partn. secs.* 3, 28. *Bundle v. Tanitor,* 4 *Conn.* 568. It was, therefore, a trust and a contract; a trust as to the realty, and a partnership contract as to the profits and losses in the sale and disposition of it.

The hazard of Plunkett in advancing the money to pay for the land, and in taking the judgment bond of Dillon to secure the repayment of it with interest out of the proceeds of the sale of it, consisted in the risk of the entire amount of it in the business, as against others who might acquire liens upon it, and as against Dillon's mismanagement, misfortune, or want of fidelity to the trust reposed in him, and his failure to apply the proceeds of the sales to the payment of it. He then referred to the depositions of two of the witnesses, Megarity and Ellen Plunkett, to establish the fact by proof of admissions made by Dillon before any question or controversy had arisen between the parties in regard to the matter, that there was such an agreement existing between him and Plunkett in relation to the purchase and sale of the land, but the Court stopped

50

him, as that was a question of fact not involved in the
cases as they now stood before this court. It was a fact
well known that many losses had been sustained in buy-
ing and selling real estate in the City of Wilmington, and
had a general commercial crisis or convulsion, such as not
unfrequently happens in our country, occurred at that
time, the depreciation of prices, the scarcity of money and
the inability of his creditors to indulge him, might at any
time have forced the property with all the improvements
made upon it, and not paid for, to an inevitable sale at a
ruinous sacrifice, that would have greatly impaired, if it
had not wholly destroyed the only security the complain-
ant had for the payment of it. Besides, in such an event,
or in any other misfortune or disaster befalling the enter-
prise, either from accident, or the imprudence, fraud or
dishonesty of Dillon, as soon as it was known that
Plunkett was and had been all the while a partner by priv-
ate agreement with him in it, and was to share the profits
and losses of the undertaking with him, particularly in
the proportions stipulated, there would not have been a
single creditor of the concern but would have demanded
payment from him of his debt, and there could be no
doubt that he would have been liable to every creditor of
the concern as such partner. *Scott v. Loyd,* 9 *Pet.* 446.
The bond and agreement were made at the same time, and
the former was but a part of and a step taken in execut-
ing or carrying out the latter, and was, therefore, quali-
fied by it, and upon the bond as so qualified by the agree-
ment, Plunkett was excluded from resorting to any other
property of Dillon's than the proceeds of the sale of the
lots for the payment of it. *War. Law Studies,* 474.

There was no ground whatever in the case for holding
that it was a contract of such a hard and unconscionable
character under the circumstances that a court of equity
would not enforce it. *Ch. on Contr.* 657, 693. It was not
fraudulent. *Ch. on Contr.* 678, 681. And there was no
proof, or even allegation, that it was procured by any mis-
representation or concealment on the part of Plunkett.

Nor was there any advantage taken of any extreme pecuniary necessity or embarrassment, or of any weakness, inexperience, improvidence, indiscretion or imbecility on the part of Dillon, to catch and draw him into such a contract. *Chesterfield v. Jansen.* 1 *Atk.* 301. *Brown v. Dewee,* 2 *Barb.* 28 *E. C. L. R.* 154, 156. Nor was there any inadequacy of consideration in the agreement. *Ch. on Contr.* 684 *note* 1, 31 *note* 1. *Gwynne v. Heaton,* 1 *Bro. Ch. Rep.* 5. *Moffitt v. Winslow,* 7 *Paige* 124. 3 *Ves. & Beams* 187. 1 *Sug. on Vend. & Pur. sec.* 1. 2 *Bro. Ch. Rep.* 167. 1 *Sto. Eq. Jur. sec.* 331. But in addition to all that had been said on the subject, it should be observed that Dillon had been guilty of a breach of the trust reposed in him, for instead of proceeding to subdivide the land into city lots simply and selling them without improvements made upon them, within a reasonable time after their purchase of it at a fair profit, he had without the consent of the complainant engaged in erecting houses and making other and expensive improvements upon them, and in speculating in the sale of them for a larger profit on his own part in such improvements, and had thereby greatly protracted and delayed the final sale and disposition of the property for a period of more than five years.

HOUSTON, J., delivered the opinion of the Court. Upon the evidence and the facts disclosed in this case, this court concurs in the opinion of his honor the Chancellor, that the written acknowledgment or memorandum signed by Dillon on the 10th of August 1864, has been sufficiently proved and established, notwithstanding his denial of it; and that it purports on its face to be an acknowledgment by him that the land referred to and described in it, was purchased by him and Plunkett jointly, and that the $3000 which the latter paid for it, was an advance by him on their joint account for that purpose, and not a loan of that amount of money by Plunkett to Dillon to enable the latter to buy it on his own account merely. But we have failed to discover any evidence in the case, either positive

or circumstantial, to impeach the validity of it, or to discredit the fair and *bona fide* character of the agreement and undertaking to which it relates; and we are therefore, not prepared to concur in the further conclusion to which he has come, that it constituted a corrupt contract for a loan of money by Plunkett to Dillon, at a higher rate of interest than six per cent. under the form and cover of a pretended contract of partnership and joint undertaking of that kind between them, for the purpose of evading the prohibition of the statute against usury. For in the first place, it expressly says that Plunkett and he purchased the land of Ferris and Garrett, Plunkett paying for the same $3000, and that he, Dillon, received the deed for it; and in the second place, that he acknowledges and agrees for himself and his heirs, that Plunkett is to be paid back his $3000 with interest, and receive as his share of the profits, if any there shall be, two-thirds, and he one-third, and if a loss should be sustained, they were to bear it in the said proportion; and in the third place, that in consideration of his receiving the deed for it, he executed that day, a judgment bond (to Plunkett understood) for $3000 for which he holds himself accountable until the property shall be sold, when the proceeds of such sale shall go to pay off said bond.

What will constitute a partnership is a question of law, but whether it exists in a particular case, is a question of fact. It can be formed only, however, by voluntary agreement, either express or implied, by two or more competent persons, joining together their property, labor, skill, and experience, or one or more of them, in the transaction of business for their joint benefit and profit; and it may be for a specific purpose, or be confined to even a particular transaction. When the question of its existence arises, as in this case, between the alleged partners themselves, there must be a common interest in the stock of it, and an agreement between them, either express or implied, reciprocally to participate in the losses as well as the profits of the business. And it has been said in one

of the judicial decisions in this State on the subject, that it is this communion of profit and loss which constitutes a complete partnership, as well between the parties themselves, as in respect to strangers who deal with them as partners. But whilst the shares of the partners, in the profits and losses must be joint, it is not necessary that they should be equal, although without an agreement to the contrary, they will be so considered. *Beecham v. Dodd*, 3 *Harr.* 485. *Gilpin v. Temple*, 4 *Harr.* 190. *Robinson v. Green's Admr.* 5 *Harr.* 115. *Davis v. White*, 1 *Houst.* 232. 1 *Pars. on Contr.* 147. Nor is it essential to the existence and validity of a partnership that all the parties interested or concerned in it, should take an active part in the transaction of the business, or even be known to others to be partners in it, for there are such partners known to the law as secret, silent and dormant partners, who become liable whenever discovered, to all persons dealing with the partnership; and one partner may agree to furnish the capital and the other to have the exclusive management and transaction of the business. Nor is it even absolutely necessary to the legal existence of it, that it should either be called, or considered by the parties themselves a partnership; because every one who by agreement of any kind is to participate to any extent in the profits of the business, becomes liable in law as a partner to third persons for the debts of the partnership, even though he may at the same time, have stipulated in the partnership contract that he shall not be liable for any of the debts or losses contracted or incurred in the business. And not only does he thus become liable in law as a partner for the debts of the firm, but he becomes liable *in solido* for the whole of them upon the insolvency of the partnership. But when, in addition to the liability thus contracted and incurred by him, he also agrees either expressly or by implication, to share or bear the losses of the business with the other party or parties concerned in it, the ground of his legal liability as a partner in it, is only the greater and more complete and conclusive, of course. 3 *Kent's Com.* 25, 30. *Gow on Partn.* 13, 14.

And it is because of this absolute liability and consequent risk and hazard of every partner for the debts and engagements of the partnership, to all persons dealing with it, at least, if not to the partners themselves, for the losses sustained by it, that it has been uniformly held that when money has been loaned or advanced to a partnership to be repaid with interest and a share of the profits of the business, the contract *per se* is not usurious, or void under the statute. It was so distinctly recognized in the case of *Morisset v. King*, 2 *Burr*. 891, which was an action of debt on a bond for one hundred pounds conditioned for the due performance of certain articles of copartnership, to be paid in four years without interest, the partners in the mean while to bear the losses and share the profits of the business equally between them, and the lender of the money to be paid in board, what was equivalent in value to thirty pounds a year for the forbearance of the loan and the use of the money. The defence was usury, but the court held that it was not usurious, and Lord Mansfield remarked that the partner who had obtained that position by means of the loan, might have been drawn into bankruptcy by it, which might have been to her more severe than the penalty of the statute of usury could be. So in the case of *Hoare v. Dawes*, *Doug*. 372, Lord Mansfield observed, " I considered this, at first, as a case of dormant partners. The law with respect to them, is not disputed, viz., that they are liable when discovered, because they would otherwise receive usurious interest without any risk; but, toward the end of the cause, the nature of the transaction, and of these loans, was more clearly explained, and I was satisfied with the verdict." The principle was also recognized in the case of *More v. Wilson*, 4 *T. R*. 355, in which Lord Kenyon, C. J., said, " Nothing can be clearer than this case. The plaintiff without having any partnership in contemplation, lent 2000 l. to H. Wilson, for which he was to receive, not only 5 l. per cent. interest, but also such surplus profits as should arise from his two shares in the business, he himself (M. Wilson, the defendant) not

being bound on the other hand to make good to the part-
ners any part of the losses which the trade might sustain.
The simple question is whether this is not an agreement
to receive more than the 5 l. per cent. allowed by law for
the forbearance of a loan? Most unquestionably it is;
and it is therefore void. It had been argued, however,
that this was not an usurious contract, because the princi-
pal was put in hazard, as it was liable to the partnership
creditors; but it was no further hazarded than in the case
of every other loan, namely, by the risk of the bor-
rower's insolvency; for as between the plaintiff and
the partners in the business, he was not liable to
contribute to the losses in the trade." But a later
and still stronger case to the same effect, is that of
*Gilpin v. Enderbey*, 7 *E. C. L. R.* 314, and which is the
latest decision of the English Courts we have been able to
find on the subject. It was an action of covenant by
Enderbey against Gilpin on an indenture between them,
whereby after reciting that they had agreed to become
partners in the trade or business of an army clothier, army
agent and woolen draper then carried on by Gilpin, it was
agreed that they should become partners in the business
for the term of ten years, and that Enderbey should advance
twenty thousand pounds as part of the capital for carrying
it on, and that being done, Gilpin alone, or with another
person mentioned as an additional partner, should advance
the residue of the capital, equal, at least, to the same
amount, and that during the continuance of the partner-
ship, Enderbey should have out of the profits of the busi-
ness, or in case of any deficiency therein, then out of the
capital thereof, two thousand pounds per annum, payable
in equal portions semi-annually, as and for his share of the
profits, and all the residue of the profits should be received
by Gilpin as and for his share of the profits of the partner-
ship; and it was further agreed that Gilpin on the determina-
tion of the partnership by lapse of time, should repay the
said sum of twenty thousand pounds to Enderbey by six
equal installments every three months, to be computed from

the determination of it, with interest thereon at the rate of five per cent. from the determination of the partnership. The breach was for the non-payment of the twenty thousand pounds with three thousand pounds for interest on the expiration of the partnership. The defendant craved oyer of the deed which was set out, and which contained besides those set out in the declaration, covenants to the following effect; that the business should be carried on in the name of Gilpin only, or in his name and that of the other person who was to be admitted as an additional partner, and that they should have the whole management of the business without any compensation made to them on that account; that Gilpin should pay all debts and expenses contracted and all losses incurred in the business out of the partnership stock and effects including the sum of twenty thousand pounds to be paid to Enderbey, and that on the determination of the partnership by lapse of time, a sufficient part of all debts due or owing to the partnership, should be fully repaid to Enderbey by six equal installments to be computed from the determination of it. The defendant then pleaded that it was a corrupt and unlawful agreement between the parties under the form of such a deed of partnership, for the loan of the said sum of twenty thousand pounds by Enderbey to Gilpin for the term of ten years at the rate of ten per cent. interest per annum payable semi-annually, contrary to the statute against usury, which the plaintiff traversed in his replication.; and upon the trial of the issue before the jury in the Court of Common Pleas, a verdict was found for the plaintiff below, Enderbey, negativing the corrupt agreement, on which the court gave judgment for him, and it was thence removed by Gilpin, the defendant below, on writ of error to the Court of King's Bench, where it was contended by the counsel for the plaintiff in error, that as all the material facts of the case and the whole contract appeared upon the face of the record sent up, and it was, therefore, in law clearly usurious and void, the court should so consider it notwithstanding the verdict of the jury to the contrary in the court below. But Abbott,

C. J. in announcing the opinion of the court said, "the indenture is set forth at large upon the record and the ground of the writ of error was, that this indenture manifestly exhibits a case of usury within the statute and ought consequently to be pronounced void in law. It professes to be a deed of partnership between these parties for ten years. The counsel on both sides agreed that by the effect of this deed, Gilpin covenants absolutely that Enderbey shall at the expiration of the ten years, receive the twenty thousand pounds therein said to have been advanced by Enderbey for carrying on the trade, whether the stock and capital of the partnership may at that time be sufficient, or insufficient for the purpose. The Court adopts this construction thus agreed upon for the purpose of its present judgment," and then after briefly recapitulating the material contents of the indenture he adds, " By the execution of this deed, Enderbey undoubtedly made himself answerable as a partner to all strangers, though he might not be answerable as between himself and Gilpin. And if the deed discloses the real facts, and the intention of the parties. to it, this is not the case of a loan of money by Enderbey to Gilpin, but a contract of partnership between them of a peculiar kind. If the deed does not disclose the real facts and the intention of the parties, but was executed only as a contrivance to cover a loan of $20,000 l. for ten years at 10 l. per cent., the deed was undoubtedly void; but this is a fact that ought to have been found affirmatively by a jury, to enable the Court thereupon to declare the deed void. No such fact has been found, and in the absence of such a finding, we must consider the deed as speaking the language of truth. And so considering it, we cannot pronounce it to be void. The partnership, as constituted by this deed, may be, and probably is, of an unusual kind : but that circumstance will not authorize us to say that there was in truth no partnership ; and if there was a partnership, there is no loan of money by Enderbey to Gilpin, and no usury. Unusual as such a partnership may be, it is by no means

51

impossible. A man carrying on trade with a capital of 20,000 l. might have made a profit of 3000 l. a year, and might really think and expect (though I cannot say that in my opinion, such an expectation was likely to be realized) that if the capital were doubled, the clear profits would be doubled also, and might, on such an expectation, engage that any person who would bring 20,000 l. should receive 2000 l. per annum, which would leave 4000 l. for himself, and so be in his estimation, a very good bargain. Some such opinion may have produced the contract between these parties. We must take their contract from the deed, and so taking it, we cannot pronounce it to be usurious. The judgment therefore, must be affirmed." The principle established in that case was also expressly ruled in the case of *Feredays v. Herndon* in the Court of Chancery before Lord Eldon. *Col. on Partn.* sec. 67. In the latter case Herndon had put into the partnership of which Feredays was a member, 4000 l. in augmentation of its capital, under an agreement admitting him as a partner in it, and by which he was to receive in lieu of profits, the clear sum of 550 l. per annum, and all the property of the concern was charged with the payment of that sum quarterly, and of the 4000 l. at the termination of the partnership. Feredays and the other partner were to pay rent, taxes, wages and all the expenses of the partnership, which was to be carried on by them in their names only, and which Herndon was not to be required to attend to, and who was to be at liberty to retire from it on giving twelve month's notice; and upon his retiring, or on the determination of it, the 4000 l., and the arrears of the 550 l. per annum, if any, were to be paid to him by the other partners by installments, to be secured by their bonds, and they were also to indemnify him against the debts of the partnership. Lord Eldon in giving judgment said that this was stated to be usury under the device of a partnership agreement. But he thought it impossible to consider it usurious. Herndon became a partner, and although he was not under any liability as between him-

self and the other partners, yet he was liable for all the debts of the concern as to all the rest of the world. He thought therefore, it could not be made out to be a case of usury. The preceding cases were in the common law courts, but the principle is the same in equity as in law, and cannot be otherwise, since what will constitute a partnership and what will constitute usury are both strictly legal questions, and neither of which can possibly have any existence independent of the law, *aut scripto, aut sine scripto,* the former by the unwritten, the latter by the written or statutory law; and therefore, notwithstanding courts of equity have now practically acquired exclusive jurisdiction of all suits of this kind between partners, and will so far take cognizance of the illegality of usury when established, as to refuse to enforce a bargain or contract tainted with it, they cannot make, or unmake either, but must follow the law strictly with regard to them, so far as they can go, for by virtue of their general equity powers, they are invested with no more authority or discretion to determine what is, or is not a partnership, or what is, or is not usury, than courts of law.

We, therefore, consider that the agreement proved in this case, constitutes *prima facie,* a contract of partnership between the parties for the purchase and sale of the land referred to on their joint account and for their mutual profit, and at their mutual risk of loss on the sale of it, in the proportions specially agreed upon by them; the $3000 advanced by Plunkett to pay for it, to be repaid to him with interest out of the gross proceeds of the sale of it when sold, if sufficient for that purpose, with two thirds of the net profits thereon, if any, and the balance thereof to belong to Dillon. And if, in the language of Abbott, C. J. in the case from which we have read so largely, the written acknowledgement in this case discloses the actual facts of it, and the intention of the parties to the agreement which it states, this is not the case of a loan of money by Plunkett to Dillon, but a contract of partnership between them of a peculiar kind; if however it does not

fully disclose the facts of the case and the true intention
of the parties to it, but was executed only as a mask,
under the form and semblance of such a contract, to
cover and disguise a loan of $3000 by Plunkett to Dillon
at a higher rate of interest in effect, than six per cent. per
annum, and thus to evade the statute against usury,
the agreement was unquestionably corrupt, usurious and
void. But no such contrivance, design, or device has
been proved or established as a fact in this case by any
evidence whatever, and in the absence of any such proof,
we must consider the acknowledgment as speaking the
language of truth; and so considering it, we cannot pro-
nounce it to be usurious and void. As was said in that
case, so we may say in this, the partnership constituted by
this agreement may be, and probably is, of an unusual
kind, but that circumstance will not authorize us to say
that there was in truth no partnership; and if there was
a partnership, there was no loan of money by Plunkett to
Dillon, and no usury. Unusual as such a partnership may
be, it is by no means impossible.

Notwithstanding, however, there is no positive or direct
proof that the agreement was a sham or device contrived
for such a purpose, or that it was not just what it purports
to be on the face of the acknowledgment, it has been
strenuously contended that we are bound to infer or pre-
sume that such was the corrupt character and design of it;
because, as we were told, it is unreasonable to suppose that
two men as shrewd and intelligent as the parties in this
case have been proved to be, could enter into such an
unequal partnership as this in good faith, the one to attend
to all the business and pay all the expense of erecting so
many houses on the land, and otherwise preparing and fit-
ting the lots for sale, and the other to do nothing and to
bear no part of the expense of such improvements, which
were to constitute not only the principal business, but the
chief element of the cost and value of the property of the
partnership; and also because the conduct and dealings of
the parties in regard to the business was inconsistent with

the relations of partners in it, inasmuch as Plunkett took no concern in the real estate or in the mode or terms of the sale of it, and because no partnership account was kept by either of them, (that kept by Plunkett being an individual account merely against Dillon, in which the transactions connected with the land, and others having no relation to it, were irregularly and improperly blended together, and in which two payments, one for $100 and the other for $300 is credited on the bond of Dillon to him for the three thousand dollars, not out of the proceeds of the sale of the land, but before any of it was sold, and afterward with two other larger credits for payments received through Bradford and Curley, but not derived from the sale of the land, and amounting together to more than $1200 ;) and further because Plunkett contracted to buy, and did buy, one of the houses erected by Dillon and the lot on which it stands, on the same footing as other purchasers who were entire strangers to their partnership transactions and without the recognition of any joint interest held by him in the premises ; and that these several considerations combined were so strong and conclusive in their character and effect as to lead to a positive conviction that it was not a genuine and *bona fide* contract of partnership, but a fraudulent contrivance in fact, under the guise and pretence of such a partnership, to make a contract for a loan of $3000 at a higher rate of interest than six per cent. so as to evade the statute against usury.

But without stopping now to consider the soundness and sufficiency of these inferences and deductions merely, it is but proper here to remark that the existence of such a corrupt and fraudulent intention thus to evade the statute, is not a legitimate matter of presumption simply, however strong it may be, in any case, either in a court of law or in a court of equity. On the contrary, where the agreement *per se*, or the contract on its face is for legal interest, or is not usurious, it must be proved that there was some corrupt agreement, or device, or shift to cover usury, and that such was the actual design and object of

it. *Bank of the United States v. Waggener et al.*, 9 *Pet.* 399. In that case Story, J., in announcing the opinion of the Supreme Court of the United States, thus states the rule in this respect : "In construing the usury laws the uniform construction in England has been (and it is equally applicable here) that to constitute usury within the prohibitions of the law, there must be an intention knowingly to contract for or to take usurious interest; for if neither party intend it, but act *bona fide* and innocently, the law will not infer a corrupt agreement. Where, indeed, the contract upon its very face imports usury, as by an express reservation of more than legal interest, there is no room for presumption, for the interest is apparent—*res ipsa loquitur.* But where the contract on its face is for legal interest only, then it must be proved that there was some corrupt agreement, or device, or shift to cover usury, and that it was in the full contemplation of the parties." And the wisdom and justice of the rule is only the more evident and obvious when we reflect that the statute is penal in its character, and as any such deliberate intention and attempt to evade it, must be characterized by a fraudulent and deceitful design against the law itself, it can not be presumed in a court of equity with any more propriety than in a court of law, but must be proved by positive evidence to have been in the actual intention and contemplation of the parties at the time when the contract was entered into by them.

But after all that has been said on the subject, was there any thing in the facts and circumstances adverted to, when properly considered, that was necessarily inconsistent with his relation as an actual and *bona fide* partner with Dillon in the particular enterprise, which was thus jointly undertaken by them ? After due reflection and consideration of the case we must say we have not been able to discover any such inconsistency. For if, as we understand the agreement, Plunkett was to have no direct interest, or property in the houses erected on the lots, or in any other improvements made upon them by Dillon with a view to promote the advantageous sale of the land for their joint

benefit and profit,we can perceive no reason, whatever, why he should have incurred any part of the expense, or had any thing to do with the business of erecting them, or in the sale of them, as the legal title to the land was by the agreement vested solely and absolutely in Dillon, to enable him alone to sell the property. Nor can we perceive any particular reason why he should have kept any partnership account in relation to such improvements, although it appears that he did keep some account of the enhanced value of the land itself, after the improvements had been made upon it, which was the only respect in which he was interested in the improvements made upon them, and the extent of his interest in them. And we must further say that we cannot discover any thing in the fact that he credited the judgment bond for $3000 in his individual account, with payments made by Dillon of other moneys than such as arose from the sale of the land, which is necessarily inconsistent with such a partnership, because it was as much Dillon's interest, as his own to have that debt paid as soon as possible; and if that was the only debt which Dillon then owed him of any considerable amount, at least, and it had to be paid by the terms of the agreement, before any dividend of net profits on the sale of the property could be made between them, it occurs to us that it was not only right and proper, but it was his duty to have so credited them; and as Dillon was directly interested in discharging the principal and interest of the debt as rapidly as he conveniently could, we take it for granted he had no objection to having them so credited. And this, we think, at the same time explains the transaction last referred to, of the purchase of one of the houses by him on a footing with the other purchasers, as it also went as a credit and a payment *pro tanto* upon the bond, and was an accommodation in that respect, which was evidently quite acceptable to Dillon. But all this we are sure might very well have been the case, and yet be entirely consistent with the fact that Plunkett was a genuine and *bona fide* partner with him in the purchase and sale of the land simply in, a special contract and joint undertaking of

this particular character for their mutual benefit and profit. There is, therefore, in our opinion, nothing in the circumstances referred to, or in the inferences properly to be deduced from them, to warrant the presumption, or conclusion that the agreement between the parties, as indica· ted in the written acknowledgment or memorandum of the 10th day of August 1864, was a corrupt contract for the loan of that sum of money by Plunkett to Dillon at a usurious rate of interest under the pretext of such a partnership contract.

We cannot, however, conclude what we have to say on this point without specially noticing the singular discrepancy, and even contradiction, which exists between this purely inferential ground of defence presented on behalf of Dillon, and the actual defence made by him, and that too under his oath, in his answer to the bill of complaint, for it is not only wholly inconsistent with the defence thus made by himself, but it is in fact, indirectly at least, expressly contradicted and denied. by it.   Because in his answer he not only omits to allege any such corrupt contract, or intention on the part of Plunkett even, but on the contrary, expressly declares that it was a loan simply to be repaid with lawful interest only, and denies that he ever agreed, either verbally or in writing, with Plunkett for the joint purchase of the land, or to pay him any interest other than six per cent. upon the loan, or to allow him two-thirds, or any other share of the profits on the sale of it.   And although we are obliged to discredit this denial of his *in toto*, yet, as we cannot conceive of any interest or motive which he could possibly have had for denying that the agreement was corrupt and usurious and therefore utterly void under the statute, if it was so, we think it is quite sufficient of itself to expose the fallacy of any inference or presumption, or reasoning merely to show that such was in fact its true character.   At all events, we cannot reconcile it to our sense of justice, equity or propriety to extend to him the benefit of such a complete defence in this case, when he not only has not made it, but has, on the contrary, expressly contradicted and denied

it in his answer, and there is no direct or positive proof whatever to sustain it.

And now having answered the objection referred to, and shown, as we think, that the agreement between the parties constituted a *bona fide* partnership contract of a special character, it substantially disposes of the whole case and of every other question raised in it, and we therefore, might here rest the decision of it. But as the objection has also been made that Plunkett incurred no substantial risk in respect to the principal of the money advanced by him to pay for the land in the partnership undertaking, as the land was certain with the improvements made upon it, to sell at any time for more than enough to pay the principal and interest upon it, we will briefly add that we consider under the terms of the agreement, as clearly appears from the bill and answer, that the judgment bond of Dillon for the amount (and which was his individual bond merely without any security) was not to be entered, or to become a lien on the land, or on any real estate of Dillon during the continuance of the partnership, or so long as the property remained unsold by him, and, in fact, was not entered and made a lien upon it, until after he had positively denied and repudiated the agreement and partnership, and more than five years after it had been given, we think that the risk which Plunkett in the meanwhile incurred of losing the whole of the debt, not so much by depreciation of the land itself, although the fluctuations in the value of real property, and particularly in localities where such enterprises are generally undertaken and carried on by speculative and artificial means and combinations of capital and labor, and largely on credit, may be extreme and sudden, as well as ruinous, but more particularly by reason of the possible failure, mismanagement, or death of Dillon, to say nothing of the specific liens and incumbrances likely in the meanwhile to be entered against the lots and houses for the large amount of materials required to be supplied on credit in making such extensive improvements, as well as other judgments which it was in his power at any time to

52

have confessed by way of preference in favor of other creditors, was, we should think, sufficiently serious and substantial in its character to deter any money lender of ordinary shrewdness and sagacity, from loaning his money on any such terms and in such an adventure as this was, without the promise, hope and expectation of a good deal more than six per cent. interest upon it at the expiration of that time. And consequently we cannot conceive what motive Plunkett could have had to incur, not only the substantial, but serious risk of such a loan on such terms, and for such an indefinite and prolonged period of credit, but the large profits which he ultimately expected to realize from the sale of the land. Besides, as the agreement between them, and Plunkett's interest in it were in the meanwhile known to no one but themselves, and the legal title to it was vested solely in Dillon, it was in the power of the latter at any moment to have put it entirely beyond the reach of the former by selling and conveying it to any one for any price he could obtain for it. Such a risk, and such a remarkable exhibition of implicit trust and confidence by a creditor in his debtor, is of very rare occurrence, we apprehend, among mere money-lenders any where, and are unquestionably much more characteristic of a partnership connection between the parties in respect to the transaction, than they possibly can be of a mere loan of money by the one to the other. But when we consider, on the other hand, that Dillon according to the agreement, incurred no risk or hazard of any loss whatever on the sale of the land itself, since, by the express terms of it, he was only to be liable to repay the principal and interest of his judgment bond for the three thousand dollars advanced by Plunkett to pay for it, as well as the two-thirds of the profits, if any, out of the proceeds of the sale of it when sold, and not otherwise, the preponderance of the risk would seem to be all against Plunkett, and that even one-third of the profits on the sale of it, would not be a very bad bargain for Dillon under such circumstances.

And the last remark will apply with equal propriety to

the objection that the claim of Plunkett for the stipulated share of two-thirds of the net profits realized on the sale of the land, is grossly inequitable and constitutes an unconscionable, if not a usurious bargain which a court of equity has the power, and ought upon that ground to refuse to enforce. This objection is based on what is alleged to be the gross inequality in the apportionment of the profits realized from the sale of the land in the proportion of two-thirds to Plunkett, in addition to the six per cent. interest on the $3000 advanced by him to pay for it, and one-third to Dillon, because the former incurred no risk of losing his money in the undertaking, and performed no labor, paid no attention to, and took no active part in the work of improving it, or in the conduct or management of the business. But if such was the understanding and agreement of the parties, who are proved to be equally capable and sagacious, and no proof, and not even an allegation made in either the answer or the cross bill filed by Dillon, that any advantage whatever was taken of his mental weakness, or inexperience or incapacity to make such a contract, or of any special and undue confidence reposed by him in the other party, or of any extreme and urgent necessity on his part for contracting such a loan and engaging in such an undertaking, or of any improper or questionable means used or efforts made by Plunkett to delude and draw him into such a contract, there certainly can be no ground on the authority of any of the rare and peculiar cases which have been decided and produced on that point, for a court of equity to refuse to decree the specific execution of it because of any real or supposed inequality in the terms or stipulations of it.

It is not necessary to refer to the cases cited on this point in the argument, as the principle of equity recognized by us and well settled by them, can possibly have no application to such a contract as this was, which was not for a loan of money to a weak or needy man imprisoned for debt, or sorely pressed and embarrassed and distressed for money by one adroitly taking advantage of either his weakness or his necessities to draw him into an

unconscionable bargain for a loan of money at an exorbitant rate of interest, but it was in our opinion a voluntary contract of partnership deliberately entered into by parties equally capable of arranging the terms and conditions of it, and in the formation of which it was competent for them to fix by express agreement the relative proportions in which they should contribute to the capital and common stock of the concern, and the proportions in which they were to share and divide the profits and losses of it between them. But again, we cannot fail to observe in this connection that nothing of this kind is alleged or intimated in the answer, or alleged or charged in the cross bill of Dillon; and yet it will be found in no case, we think, that a court of equity has ever interposed to relieve a party from the hardship of an exorbitant and unconscionable bargain or contract, on that ground alone, unless where it was specifically alleged as the ground of complaint or defence, and was as distinctly proved and shown to the satisfaction of the court. As to the case of *Godwin v. Collins, ante p.* 28, in this court which has been cited on this point, it has, we apprehend, no proper application in the present case. It was upon a bill filed for the specific performance of a contract for the purchase of a farm, and under the particular facts of the case proved, the court in the proper exercise of that equitable discretion with which it is invested in such cases in particular, refused to decree a specific performance, and left the complainant to his action at law for the breach of the agreement, as an adequate remedy for any injury which he had sustained in the premises.

It is therefore the opinion of this Court that his honor the Chancellor erred in the court below in disallowing the claim of the complainant, Plunkett, for two-thirds of the profits of the sale of the said land by Dillon, the defendant, but not in any other allowance or disallowance made by him in the several counter claims or accounts of the parties respectively, as the same were adjusted and settled by his decision and decree in that court. And inasmuch as it appears that thereupon the counsel for the parties re-

spectively in said court agreed upon a statement of their mutual accounts on the basis of that decision and settlement and in conformity therewith, showing a balance due from Plunkett to Dillon of $4626.10 on the 19th day of April in the present year, for which, among other things a decree was thereupon entered in favor of Dillon against Plunkett; and inasmuch as it further appears to the satisfaction of this Court that the said Dillon should account to the said Plunkett for two-thirds of the profits of the sale of the said land so sold and retained by him under the said partnership agreement, at the full and fair price and value for which the same were sold by him, from time to time, or retained by him, according as the same has been estimated and ascertained by all the evidence which this Court now has on the subject, in addition to such allowances of his account against Dillon as were made him in the court below, the court after stating the basis on which it had calculated and ascertained the value of the respective lots or parcels of the land so sold by him with interest thereon from the time of the sale of them respectively, together with the value of the lot retained by him with interest thereon from the 2nd day of May 1870 up to the present time, according to the evidence, proceeded as follows: that it amounts in the aggregate, to $7853.39, from which deducting $3007, the price paid for the land and stamps for the deed, leaves $4846.39, as the total profits realized from the sale of them, including the part so retained by Dillon as before stated. That the two-thirds of it due to Plunkett, as his share of the profits will be $3230.82, and that when the same is deducted from the said sum of $4626.10, ascertained and conceded by agreement of the counsel of the parties respectively in the court below, with interest thereon from the 19th day of April last to the present time, amounting together to the sum of $4763.-35, will leave the sum of $1532.53, as the true and correct balance now due to the said Dillon from the said Plunkett.

The decree below was accordingly ordered to be so rectified, and both parties were perpetually enjoined from proceeding further against each other at law, &c.